Filed 5/5/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048644 |
| v. | (Super. Ct. No. 11CF1199) |
| ANNAMARIA MAGNO GANA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseño, Judge.  Affirmed.

Law Offices of Alan Fenster, Alan Fenster and Ryan M. Ahern, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Brendon W. Marshall and Kathleen Radez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Annamaria Magno Gana guilty of the first degree murder of her husband Antonio Potenciano Gana, and the willful, deliberate, and premeditated attempted murders of her two sons, Tony Gana and Alfonso Gana. In addition, the jury found defendant committed the murder while lying in wait and that she personally discharged a firearm in committing the murder and one of the attempted murders. The trial court denied defendant's new trial motion, but granted the prosecution's request to reduce her conviction on count 1 to second degree murder and to strike the lying in wait finding for sentencing. It then imposed a 40-year-to-life prison term for the murder and lesser, concurrent terms for each of the attempted murders.

Defendant appeals, contending the trial court committed reversible error in denying her requests to instruct the jury on misdemeanor manslaughter and unconsciousness, its failure to modify an instruction on evidence regarding mental disease or defect, plus its exclusion of testimony by a physician who treated her after the shootings. In addition, defendant argues her trial attorneys failed to provide her with effective assistance. Since we find no prejudicial error, the judgment is affirmed.

FACTS

One afternoon in May 2011, defendant shot and killed her husband and chased after her fleeing sons, shooting at and striking her eldest son while the younger child hid. Defendant then attempted to shoot herself in the head, but the bullet merely grazed her neck.

At trial, Tony Gana described the shooting as follows: "I hear[d] this loud noise. . . . Alfonso yells that it was a gunshot. And then my Dad gets up, runs to the [bed]room, Alfonso and I right behind him[.] . . . I stop at the doorway, my Dad rushes in, and I see my Mom holding a gun[.] . . . [T]hen [my Dad] tries to grab the gun from her. I see him get shot, and Alfonso and I run away. I reached the kitchen, but then I

2

stopped, because I didn't believe that it was real[.] . . . I turn around, I see Alfonso hiding behind one of the couches, and then I see my mother chasing after me with a gun. I yell at her don't shoot, then she shoots me, and I fall to the ground[.] . . . I hear another gunshot, I thought it was for me, but it wasn't[.] [T]hen I see Alfonso taking away the gun from my Mom, and that's when I run out and called 911." He described defendant as "look[ing] possessed. . . . [H]er eyes were wide open, they looked bigger than normal. No emotion on her face."

Alfonso Gana testified that after defendant shot and wounded his brother, he saw her point the gun at her head and fire it. She then started crying and saying, "'What – what did I do.'" Alfonso picked up the gun from the floor and left to find his brother.

Responding law enforcement officers found defendant in the master bedroom holding her husband and crying. Antonio Gana was bleeding from a bullet wound on his chest. He was transported to a hospital, but later died. There was no soot, stippling or gunpowder residue found on Antonio Gana's body, indicating he was more than two feet from the end of the gun's barrel when defendant shot him. The prosecution presented evidence that the revolver defendant used required the hammer to be cocked before a trigger pull would cause the gun to discharge.

A deputy sheriff testified that when he approached defendant, she was silent and had her eyes closed. He nudged her and she opened her eyes, "star[ing] straight ahead" with what he described as "a thousand mile stare." He asked defendant "'who shot,'" and she responded, "'I did, I did, please kill me.'"

Defendant did not respond when paramedics asked her a series of standard questions, but merely opened her eyes and stared. They transported her to a hospital with an assessment of having "an altered level of consciousness."

At the hospital a tube was inserted into defendant's mouth to assist her breathing. A deputy sheriff guarding defendant testified that when she awoke the next

morning, she removed the tube from her mouth and began making statements that she wanted to die. Defendant repeated these statements to attending nurses and a doctor, explaining she had killed her husband and shot her children.

While still at the hospital, defendant was questioned by sheriff's investigators. The interrogation was audiotaped and the recording played at trial.

After being advised of her *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]), defendant told the investigators that in late 2010, she had been diagnosed with breast cancer. At the time of the shooting she was receiving chemotherapy and also taking Ambien to help her sleep. In addition, she was under stress from the financial problems of operating a business that was not doing well. She and her husband were attempting to sell the business, but she was concerned the sale would not occur. Defendant claimed to be overwhelmed with everything that needed to be done.

For weeks before the shooting, she claimed to have suicidal thoughts and developed a plan to kill her husband and children before taking her own life. Defendant told the investigators she heard a voice in her head telling her that she needed to carry out her scheme. The morning of the shooting she loaded the gun. Some friends visited their home that afternoon. After the friends left, defendant went to the bedroom, retrieved the gun, and fired a shot into the ceiling. She re-cocked the weapon and when her husband entered the bedroom, she aimed at his heart and shot him. She then ran after her sons and shot her older son. Defendant also thought she shot at her younger son before turning the gun on herself. She recalled Alfonso grabbing the gun as it discharged. When the police arrived, defendant acknowledged telling them she wanted to die.

The defense called medical experts to testify about defendant's physical and mental condition before the shooting. The oncologist treating defendant testified that she had been diagnosed with an aggressive form of breast cancer. After undergoing a double mastectomy, defendant was placed on a chemotherapy regimen that involved four

4

separate drugs. The drugs can cause patients to suffer memory loss, fatigue, difficulty remaining focused, as well as exhaustion. Because defendant developed a rash caused by the cancer medications, she was also given steroids that had side effects, including psychosis, mood disorder, and insomnia. The Ambien prescribed for her insomnia also had the potential to cause psychosis in rare circumstances. However, the oncologist's notes indicated that while defendant complained of loss of appetite, fatigue, a skin rash, and losing her hair in addition to insomnia, she did not mention suffering from depression, mood changes, or psychosis.

Dr. Michael Tramell, a psychiatrist who interviewed defendant, expressed the opinion that defendant was suffering from a psychotic depression on the day of the shooting. He claimed this condition resulted from a "combination of factors, including both her depression as well as the medications she was taking. It appears she was experiencing a delirium, which is a kind of fluctuating level of consciousness, due to medical illness that caused her to . . . have worsening symptoms of depression and worsening psychoses."

The defense also called Dr. Kevin Booker, a psychologist. He said defendant was "suffering from . . . a clinically significant . . . major depression" when he interviewed her. Booker concluded that at the time of the shooting, defendant's "'thoughts/beliefs and actions [were] related to a severe mental state-specific psychiatric condition and not to asocial psychopathological character traits.'"

Defendant testified in her own defense. She claimed that she began feeling depressed during the second cycle of her chemotherapy. When she developed a rash from the medications, she found it difficult to sleep. The oncologist prescribed Ambien to help her sleep and some medication for her rash. Defendant also lost her appetite. She felt weak, fatigued, and had difficulty reading.

On the day of the shooting, defendant claimed she was sad, depressed, tired, and did not feel normal. She recalled having breakfast with her family, the arrival

5

of friends for a visit, and trying to handle business paperwork.  Defendant went to her bedroom to get some sleep and to be alone.  She testified she was "feeling helpless, feeling depressed, feeling like every single problem was a major problem."

On direct examination, defendant said she recalled retrieving the gun, recognizing what it was, seeing bullets, and wanting to die.  But she could not remember loading the weapon.  Defendant also recalled hearing a gunshot, seeing her husband and children enter the bedroom, being in the living room with her elder child, and hearing her younger son call her name.  But she did not remember aiming and firing the gun at any of them.  Defendant claimed her next recollection was hugging her husband in the bedroom, then seeing people, being in an ambulance, and waking up in a hospital.

On cross-examination, the prosecutor asked defendant about an entry in Tramell's report where she told him that "'she began to plan how she might kill herself'" at lunchtime on the day of the shooting and loaded the weapon shortly thereafter.  Defendant said she could not recall making this statement.  The prosecutor also questioned her about Tramell's claim she expressed the belief that her family "'wouldn't be able to live without [her],'" and thus she "'need[ed] to kill them so we can all die together and no one has to suffer.'"  Again, defendant denied any recollection of making this statement.  Defendant also denied telling Booker "'we were all going to die because everyone was getting sick.'"

Defendant claimed her recollection of events at the hospital were equally vague.  She remembered seeing a nurse, a sheriff's deputy, speaking with the investigators, plus learning her children were okay, and that her husband was dead.  But she denied any recollection of what she said to the investigators even after listening to the audiotape of her interrogation.

6

DISCUSSION

1.  *Instructional Error*

        *1.1  Background*

                The trial court instructed the jury on the charged crimes of first degree murder, based on theories of a willful, deliberate, and premeditated killing and by lying in wait, and attempted murder.  In addition, the court gave instructions on the lying in wait special circumstance allegation as to the murder count and whether the attempted murders were committed willfully, deliberately, and with premeditation.  The court also instructed on the lesser included offense of second degree murder resulting from either an intentional but unpremeditated killing or the commission of a dangerous act with a conscious disregard for life.

                Concerning the evidence of defendant's state of mind during the shooting, the court gave the following instructions:  CALJIC No. 3.32 (jury may consider evidence of mental disease or defect "for the purpose of determining whether the defendant actually formed the required specific intent or mental state which is an element of the crimes charged or the lesser crime or any of the allegations"); CALJIC No. 4.21 (relevance of intoxication "in deciding whether the defendant had the required specific intent and/or mental state"); and CALJIC No. 8.73.1 (evidence of hallucination or delusion may be considered "on the issue of whether" defendant "killed or attempted to kill with or without deliberation and premeditation and/or lying in wait").  But the court denied defense requests for instructions on voluntary manslaughter and involuntary manslaughter as lesser included offenses to the murder charge, and on the defense of unconsciousness.

                Defendant contends the trial court committed prejudicial error in refusing to instruct the jury on involuntary manslaughter and unconsciousness, and in giving a

7

version of CALJIC No. 3.32 that failed to clarify the evidence of mental disease or defect could be used to determine whether she harbored malice.

### 1.2 Involuntary Manslaughter

Involuntary manslaughter is defined as an "unlawful killing . . . without malice" where the killing occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).) Defendant argues the first alternative applies in this case, citing the evidence on her state of mind and claiming the shooting of her husband could be found to have resulted from the act of brandishing a firearm. (Pen. Code, § 417, subd. (a)(2).)

We disagree. "[A] trial court must . . . instruct the jury on lesser included offenses 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.'" (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.) But "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[S]uch instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury," i.e., ""evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed." (*Ibid*.)

Defendant focuses her argument on the evidence concerning her mental condition and the effects of the medication she was taking at the time of the shooting. The trial court did instruct the jury they could consider that evidence in relation to whether she formed the specific intent and mental state required for each of the charged crimes. Further, as to count 1 the jury was provided the alternative of convicting

8

defendant of second degree murder on two separate theories if it concluded the evidence failed to support a first degree murder verdict.

To support an instruction on involuntary manslaughter based on brandishing a firearm there had to be evidence defendant "dr[e]w or exhibit[ed] a[]firearm . . . in a rude, angry, or threatening manner." (Pen. Code, § 417, subd. (a)(2).) Cases holding the evidence supported a brandishing charge involve scenarios where the crime was preceded by a quarrel or confrontation between the participants. (*People v. Lee* (1999) 20 Cal.4th 47, 61 ["defendant used his gun in a quarrel" where he and his wife were arguing and pushing each other]; *People v. Rivera* (2003) 114 Cal.App.4th 872, 875-876 [defendant pointed gun at the victim when he attempted to intervene in a fight with a girlfriend,]; *People v. Mercer* (1980) 113 Cal.App.3d 803, 805-806 [ordered to surrender his firearm, defendant assumed a classic gunfighter stance and told officer to come and take it].)

The evidence at the trial in this case is distinguishable. Defendant acknowledged Antonio Gana had been a good husband. The children testified defendant was in the bedroom alone and there was no fight, quarrel, argument, or struggle between her and her husband that preceded the shooting. When Antonio and the children reached the bedroom after the first shot, they saw defendant sitting on the bed holding the gun. Without saying anything, she shot her husband while still several feet away from her before chasing after the children shooting at and striking at least one of them. Under these circumstances, the trial court did not err in refusing to give the requested involuntary manslaughter instruction based on a misdemeanor-manslaughter theory.

### 1.3  CALJIC No. 3.32

The version of CALJIC No. 3.32 given to the jury provided:  "You have received evidence regarding a claim or claims of mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crimes charged.  You

9

should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent or mental state which is an element of the crimes charged or the lesser crime or any of the allegations. You are not allowed to consider this evidence for any other purpose." Further, the trial court also told the jury: "The mental states required are included in the definitions of the crimes or circumstance or allegations set forth elsewhere in these instructions."

Defendant argues CALJIC No. 3.32 was deficient "because it did not clearly indicate that evidence of mental defect could be used for the determination of the presence of malice aforethought." This argument lacks merit.

"'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.) "'[T]he absence of an essential element in one instruction may sometimes be supplied by another. . . .'" (*People v. Rhodes* (1971) 21 Cal.App.3d 10, 21.) Furthermore, "'"'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.'"'" (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1220; *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) Consequently, "[i]n reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.'" (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1220.)

*People v. Rundle* (2008) 43 Cal.4th 76, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, rejected a similar complaint. There it was also argued "the trial court erred by failing to specifically name for the jury the intent or mental state to which defendant's 'mental condition' evidence was relevant," and "without such an instruction, it is likely the jury did not understand that premeditation and deliberation and the specific intent to commit rape were the intent and mental states to which this instruction referred." (*People v. Rundle, supra,* 43 Cal.4th at

10

p. 148, fn. omitted.)  The Supreme Court disagreed:  "We previously have rejected challenges similar to defendant's regarding the failure explicitly to define the term 'mental states' in instructions concerning the effect of a mental defect upon the defendant's ability to form mental states required for the commission of various offenses. Thus, we have found no error in cases in which a mental defect instruction merely mentioned the term 'mental state' in a generic sense, but the trial court elsewhere either specifically explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder [citations], or generally instructed that '"[t]he mental state required is included in the definition of the crime charged."'"  (*Id.* at p. 149; *People v. Smithey* (1999) 20 Cal.4th 936, 988-989 ["the court instructed the jury that '[t]he mental state required is included in the definition of the crime charged[]'" and "the definition of murder included an explanation of malice, premeditation, and deliberation"].)

The same is true here.  Defendant does not contend the trial court failed to adequately instruct the jury on the elements of the charged crimes, including the element of malice aforethought.  Applying the appropriate standard of review, we conclude there is no possible likelihood the jury failed to properly apply CALJIC No. 3.32.


### 1.4  Unconsciousness

The defense also unsuccessfully sought instructions on unconsciousness, both as a complete defense and, in the event the jury found defendant acted while voluntarily intoxicated, to reduce her conviction on the murder charge to involuntary manslaughter.  On appeal, defendant claims the trial court committed reversible error in refusing to give these instructions, arguing there was substantial evidence her medical condition and the medications she was taking "caused [her] to suffer a severe level of delirium resulting in fluctuating levels of consciousness at the time of the shooting."

11

We agree the evidence sufficed to support the requested instructions. A person "who commit[s] the act charged without being conscious thereof" is deemed incapable of committing a crime. (Pen. Code, § 26, Fifth par.) "Unconsciousness for this purpose need not mean that the actor lies still and unresponsive . . . . Thus unconsciousness "'can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting.'"" (*People v. Ochoa* (1998) 19 Cal.4th 353, 423-424; *People v. Methever* (1901) 132 Cal. 326, 329, overruled on other grounds in *People v. Gorshen* (1953) 51 Cal.2d 716, 731-734 [unconsciousness "contemplates . . . cases of persons of sound mind,—as, for example, somnambulists, or persons suffering with delirium from fever or drugs"].) It "'is ordinarily a complete defense to a charge of criminal homicide,'" unless "'the state of unconsciousness results from intoxication voluntarily induced . . . . (Pen. Code, § 22.)'" (*People v. Ochoa, supra,* 19 Cal.4th at p. 423.)

Although defendant gave a detailed accounting of the shooting and her motivation for it shortly after the incident, at trial she testified to having only a limited recollection of the event, acknowledging only that she held the gun and heard a shot. "That [s]he did not, by the time of trial, accurately recall certain details of the shootings does not support an inference [s]he was unconscious when [s]he committed them." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418.)

But here there was other evidence that justified giving unconsciousness instructions. Tony Gana testified defendant's eyes were wide open and her face lacked emotion when she shot his father. A deputy sheriff also described her as having "a thousand mile stare" and paramedics said she remained silent when asked a series of standard questions.

Additionally, "medical testimony . . . as to why [the defendant] was unconscious" can support an instruction on this defense. (*People v. Coston* (1947) 82 Cal.App.2d 23, 40.) The defense presented the testimony of medical experts who identified the medications defendant was taking to combat cancer and to overcome the

12

adverse effects of the chemotherapy, and explained how these medications could affect her mental state. In particular, Tramell concluded defendant was suffering from a psychosis likely caused by "a combination of events, combination of factors, including both her depression as well as the medications that she was taking. It appears that she was experiencing a delirium, which is a kind of fluctuating level of consciousness, due to medical illness that caused her to . . . have worsening symptoms of depression and worsening psychoses."

Thus, we conclude the evidence supported instructions on unconsciousness. Nonetheless, the trial court's refusal to give them does not require a reversal of the judgment. The absence of an instruction on a defense is not prejudicial if "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding [favorable to the defendant] has been rejected by the jury.'" (*People v. Wright* (2006) 40 Cal.4th 81, 98.)

Here, the refusal to instruct on unconsciousness did not bar defendant from presenting a meaningful defense based on her mental condition because she "was permitted to use the same underlying facts to mitigate the crime[s]." (*People v. Maury* (2003) 30 Cal.4th 342, 422.) On the charged crimes and allegations, the court told the jury it could consider the evidence of mental disease, defect, or disorder in determining whether defendant "actually formed the required specific intent or mental state[s]." And the jury was told that if it found she suffered from a hallucination or delusion during the shooting, it could consider this evidence in determining whether she "killed or attempted to kill with or without deliberation and premeditation, and/or lying in wait." The court also instructed the jury that if it found defendant was intoxicated, it could consider this fact "in deciding whether [she] had the required specific intent and/or mental state" for

13

the crimes. Further, as to the murder charge the jury was given the option of convicting defendant of the lesser included offense of second degree murder.

Granted, the jury was not asked to decide whether she was unconscious when the shootings occurred. But neither was it told to presume defendant was conscious at that time. The jury was afforded the opportunity to consider how her cancer and the drugs she was taking to combat the disease affected her ability to form the specific intents and the mental state of malice necessary to support her convictions on the charged crimes and the true findings on the associated special circumstance and allegation. By its verdicts and findings the jury clearly "rejected defendant's [mental state] defense" (*People v. Maury, supra,* 30 Cal.4th at p. 422) in another context and thus the refusal to instruct on unconsciousness was harmless error.

## 2. Exclusion of the Treating Physician's Testimony

### 2.1 Background

In an amended witness list filed shortly before trial, the defense included the name of Dr. Ebtesam Khaled, describing her as "a psychiatrist who worked with the Orange County Jail and was the defendant's physician/psychiatrist . . . while defendant was incarcerated." But during trial, defense counsel claimed Khaled worked at the hospital where defendant was initially taken after the shooting, and asserted her testimony would rebut that of the sheriff's investigator who had stated defendant "appeared to [be] awake and alert" during the interrogation. Defense counsel represented that Khaled "had created . . . notes" which described defendant as having "impaired judgment" when the sheriff's investigators questioned her. However, defense counsel acknowledged "We haven't spoken to her yet." The court informed the defense Khaled "is not going to testify until you make an offer of proof."

Later when the court asked for the offer of proof, defense counsel acknowledged they still had not spoken to Khaled. But, citing a copy of her notes,

14

repeated the claim she would testify as a percipient witness concerning her assessment of defendant's "medical condition" and the medications administered to her. The prosecutor objected to allowing Khaled to testify. He disputed the claim she was a percipient witness because the copy of her notes that had been provided to him indicated she worked at the jail, not the hospital where the interrogation occurred. The prosecutor further argued the jury had already heard extensive testimony from the other defense experts about defendant's mental condition.

In reply, defense counsel acknowledged Khaled was employed at the jail hospital, but insisted she could still rebut the investigator's testimony. The trial court denied the request to call Khaled, concluding the defense failed to make "a sufficient showing" and "I think that falls within [Penal Code section] 1054."

### 2.2 Analysis

Defendant contends the trial court committed prejudicial error in excluding Khaled's testimony, claiming she was the only witness "who would be able to testify as to [defendant's] medical treatment and condition at the time of the interrogation."

First, it is undisputed the defense failed to timely disclose its intent to call Khaled as a witness. (Pen. Code, §§ 1054.3, subd. (a)(1), 1054.7.) One of the sanctions available for violating discovery is "prohibiting the testimony of a witness." (Pen. Code, § 1054.5, subd. (b).)

Defendant argues she was excused from compliance with the discovery statutes because the defense did not recognize the relevance of Khaled's testimony until the investigator testified about her state of mind during a pretrial hearing on the admissibility of her confession. But even if true, she failed to make a sufficient showing Khaled could provide relevant testimony on her medical condition when questioned by the sheriff's investigators. The record reflects Khaled worked as a physician at the jail. The investigators interrogated defendant while she was still at the hospital before her

15

arrest and incarceration. We review rulings on the admission or exclusion of evidence under an abuse of discretion standard (*People v. Prince* (2007) 40 Cal.4th 1179, 1222; *People v. Lamb* (2006) 136 Cal.App.4th 575, 581), and since it is doubtful Khaled could provide relevant testimony on defendant's mental condition when interrogated, the appellate record does not reflect the trial court's ruling was arbitrary or capricious.

However, defendant further contends her trial attorneys were incompetent in failing to timely list Khaled as a defense witness and make an adequate showing that her testimony was probative on defendant's state of mind during the interrogation. Thus, we must further consider whether excluding this testimony caused defendant prejudice.

The answer is no. A defendant asserting he or she failed to receive the effective assistance of counsel "bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) But since "'[t]he object of an ineffectiveness claim is not to grade counsel's performance'" (*In re Cox* (2003) 30 Cal.4th 974, 1019), where "'it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.'" (*Id.* at pp. 1019-1020; quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 80 L.Ed.2d 674].) "[T]o demonstrate prejudice . . ., a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Banks* (2014) 59 Cal.4th 1113, 1170.) "[A] ""reasonable probability is defined as one that undermines confidence in the verdict."'"" (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

Defendant argues Khaled's testimony was "essential to the defense theory that [her] statements to [the sheriff's investigators] were the product of the hospital's chemical restraints (resulting in a coma), the medications provided by the hospital, and

16

her mental state." This contention is incorrect. As just discussed, the record indicates Khaled did not see or treat defendant until after defendant was transported to the jail.

Further, other evidence was presented concerning defendant's medical condition and the medications she received at the hospital. The prosecution presented the testimony of the deputy sheriff who guarded defendant at the hospital on the morning after the shooting and one of the investigators who questioned her. The defense had the opportunity to cross-examine both of these witnesses. In addition, the jury listened to an audiotape of the interrogation, which included defendant's correct responses to questions on the day of the week, the month, the year, and the name of the president. The accuracy of defendant's statements to the investigators were confirmed to a certain extent by the similar statements she made to Tramell and Booker when each of them interviewed her.

The defense was allowed to introduce evidence that questioned defendant's state of mind during the interrogation and identified the medications that had been previously administered to her. Defendant testified at trial, describing for the jury what she recalled about the interrogation. Tramell identified certain aspects of the recorded interrogation he claimed reflected defendant's psychotic behavior. He mentioned the "increased latency [delayed response to questions] in her speech," the "mild slurring of her words," "emotional liability where all of a sudden she would just burst into tears and wail[]," and "inappropriate answers to questions." Booker testified that he had reviewed the hospital records and noted she received antipsychotic medication while at that facility.

Consequently, the jury received evidence that allowed it to assess defendant's mental condition during the interrogation and to determine the credibility of the answers she gave to the investigators. Even assuming defense counsel were ineffective in failing to timely list Khaled as a potential witness or make an adequate offer of proof on the relevance of her proposed testimony, it did not cause prejudice to

17

defendant and the absence of her testimony does not undermine our confidence in the jury's verdicts.

*3. Ineffective Assistance of Counsel*

In addition to attacking the adequacy of her attorneys' efforts to introduce Khaled's proffered testimony, defendant argues they failed to provide her with the effective assistance of counsel in two other contexts; failing to timely research the law on involuntary manslaughter, and not objecting to the prosecutor's purported misstatement of law during closing argument.

These contentions are not supported by the appellate record. As for the claim counsel "failed to properly research the relevant law on diminished capacity or the effect of mental deficiencies on the lesser included offense of manslaughter before trial," defendant's attorneys asked the court to instruct on both voluntary and involuntary manslaughter, including the misdemeanor-manslaughter theory defendant asserts in this appeal.

The remaining assertion is that counsel failed to object to the prosecutor's purported misstatement of the law during closing argument. But the record reflects that the prosecutor merely confused the CALJIC instruction numbers addressing the issues of mental condition and hallucination: "When you go back into that room and you start thinking about intent to kill and malice aforethought, you're going to talk about that, you find somebody saying well, let's talk about hallucination, you should s[ay] no, wait, 3.32 says we are not allowed to consider it. And 8.73.1, actually 8.73.1 has that information. [¶] Be true to your oath. The actual instruction continues, and it's more specific, 8.73.1, or 3.32, use the one in yellow, 8.73.1. If you find it to be true that the defendant suffered from a hallucination and/or delusion, you may consider the impact of this hallucination and/or delusion, if any, I submit to you there was none, if any, on the issue of premeditation and deliberation and/or lying in wait. However, you must not consider this

18

evidence for any other reason, including the issue of the specific intent to kill.  I wasn't making that up.  You're not allowed under the law to consider hallucinations or delusion on the intent to kill."  As the foregoing quotation indicates, the prosecutor mixed up the numbers of the instructions concerning use of evidence of mental disease or defect and hallucination or delusion.  But the point made by him did not misstate the instruction.  Consequently, there was no need to interpose an objection.

We find defendant's claims of ineffective assistance of counsel are without merit.

**CERTIFIED FOR PUBLICATION**

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

I CONCUR:

ARONSON, J.

19

Moore, J., Concurring and Dissenting.

I agree with most of the majority opinion. The majority found the trial court erred in failing to instruct the jury on the defense of unconsciousness as a result of defendant taking drugs to combat her cancer (chemotherapy) and to overcome the effects of chemotherapy. (Maj. opn., *ante*, p. 12.) I concur in that decision. I respectfully dissent, however, from the conclusion that the error was harmless. I also would find the court prejudicially erred in failing to instruct on unconsciousness without reference to voluntary intoxication.

Defendant's oncologist, Dr. Andreea Nanci, described defendant's chemotherapy regimen. She pointed out one of the drugs in her treatment is known to cause potential neurotoxicity. Exactly how the drug causes the neurotoxicity is subject to ongoing research. One side effect of the chemotherapy treatment defendant received is known as "chemo brain." A doctor testified "most chemotherapy agents can result in significant . . . incidence of . . . delirium, agitation, psychoses, [and] *fluctuating levels of consciousness*." (Italics added.) When side effects occur, they last "at least several weeks, usually more, months, in occasional patients, years." The reason is because there is not just the immediate effect of the chemotherapy drugs, but also their cumulative effect as an affected patient goes through each additional cycle of chemotherapy. Defendant went through four cycles of chemotherapy. It is important to note, "the particular side effects for a given patient cannot be predicted because everybody is different."

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. ([Pen. Code,] § 26, class Four; *People v. Coogler* (1969) 71 Cal.2d 153, 170; *People v. Newton* (1970) 8 Cal.App.3d 359, 376; see also [Pen. Code,] § 20 [to constitute a crime there must exist a joint operation of act and intent].) To constitute a defense, unconsciousness need not rise to the level of coma or inability to

1

walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' (*Newton*, at p. 376.) If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense. (*Id.* at p. 377, citing *People v. Wilson* (1967) 66 Cal.2d 749, 764.)" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) On the other hand, unconsciousness "'is not a complete defense'" when it results from voluntary intoxication (*People v. Ochoa* (1998) 19 Cal.4th 353, 423), but it may reduce a murder to involuntary manslaughter (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1081-1082).

In terms of *voluntary* intoxication, I see a distinction between ingesting alcohol or narcotics, and undergoing chemotherapy. Subjecting one's self to chemotherapy can hardly be considered "voluntary" on the part of the cancer patient when the alternative is death. Here, defendant had a particularly aggressive cancer that already required a double mastectomy. Surely we would not hold a defendant's statement to police was "voluntary" if it was made in response to a threat of death. (See *People v. Williams* (1997) 16 Cal.4th 635, 659 [prosecution bears burden of proving voluntary nature of confession]; *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332, 1335 [exploiting mother's fear that she would not see her child for a long time if she failed to cooperate made subsequent statement involuntary].)

In terms of intoxication, itself, there is a difference between voluntarily ingesting alcohol or narcotics—acts which may be undertaken to acquire an intoxicated state, and which everyone knows adversely affects the way the brain reacts—and receiving chemotherapy. While there was testimony chemotherapy *may* have certain *side effects*, nobody undergoes chemotherapy to become intoxicated.

The majority concludes the error in failing to instruct on unconsciousness was harmless. (Maj. opn., *ante*, p. 13.) In doing so, the majority noted the jury had not only been instructed that it could consider any hallucination or delusion in determining on the issues of whether she killed or attempted to kill with deliberation and

2

premeditation, and/or by lying in wait, that intoxication by defendant could be considered in determining whether defendant had the required specific intent or mental state, but also that "it could consider evidence of mental disease, defect, or disorder in determining whether defendant 'actually formed the required specific intent or mental state[s].'" (*Ibid*.) The majority reasoned that as the jury returned a verdict of guilty for first degree murder, which required the jury to find defendant premeditated and deliberated killing her husband, or killed him by means of lying in wait, the jury rejected evidence of defendant's unconsciousness. (*Id.* at pp. 13-14.)

I agree that when there is reason to believe the jury through its verdict impliedly rejected a defense theory, the failure to instruct on that theory may be harmless under state law. (See *People v. Maury* (2003) 30 Cal.4th 342, 422 [error harmless where although defendant was deprived of the complete defense he used the same evidence to mitigate crime]; *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant"]; *People v. Millwee* (1998) 18 Cal.4th 96, 157 ["failure to instruct on a lesser included offense is not prejudicial where 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant'"].)

The majority's analysis, to my mind, does not demonstrate the failure to instruct on unconsciousness was harmless. Here's why. People generally think if an individual undertakes some action—walking, talking, shooting a gun, for example—that action can only be done by someone who is conscious. Unconsciousness is generally thought of as meaning an individual is comatose or otherwise incapable of movement, but that is not what the law holds. In fact, when the court and counsel discussed proposed jury instructions, the prosecutor argued there was no evidence of unconsciousness. In doing so, he urged the fact that defendant opened her eyes when asked questions by a responding paramedic demonstrated she was conscious. But as CALCRIM No. 626

3

states, one who is unconscious "*may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions*." (Italics added.) For purposes of a defense, "'[u]nconsciousness' . . . need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." (*People v. Newton*, *supra*, 8 Cal.App.3d at p. 376, fn. omitted.) Without informing the jury of this fact, the jurors would have no reason to conclude defendant was not conscious during any of her actions. The conclusion is unavoidable that jurors would fall into the same misconception the prosecutor demonstrated; assuming any action on defendant's part—including opening her eyes—means she was conscious. Thus, the jury's verdict cannot be said to have been the result of the jury's rejection of an unconsciousness defense. Consequently, the error was not harmless under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Breverman* (1998) 19 Cal.4th 142, 170, & fn. 19.)

Because the error was prejudicial under *Watson*, there is no need to determine whether the failure to instruct on involuntary unconsciousness is governed by a more stringent reversible error standard. (See *People v. Newton*, *supra*, 8 Cal.App.3d at p. 377 ["Where evidence of involuntary unconsciousness has been produced in a homicide prosecution, the refusal of a requested instruction on the subject, and its effect as a complete defense if found to have existed, is prejudicial error."]; *Neder v. U.S.* (1999) 527 U.S. 1, 19 [failure to instruct on issue of materiality in a mail fraud case was harmless where issue was not contested and evidence established the element as a matter of law, but result would have been different if defendant contested the element and raised evidence on the issue].)

The trial court's failure to instruct on unconsciousness was prejudicial error. Without receiving an instruction on unconsciousness, the jury was presumably unaware that one may commit an act without being conscious of the act. Consequently,

4

defendant's conviction cannot be considered an implied rejection of a complete defense the jury had not been instructed on, especially when the instruction is *contrary* to what most people believe. Accordingly, I would reverse.


MOORE, J.


5