Filed 11/26/25  P. v. Brice CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B338385 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA504250) |
| v. | |
| JONATHAN BRICE, | |
| Defendant and Appellant. | |

 

Appeal from judgment of the Superior Court of Los Angeles County, Deborah S. Brazil, Judge.  Affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Lauren N. Guber, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

On March 29, 2022, Recara Snell[1] suffered a fatal gunshot wound to the head while standing at the front door of the apartment she shared with her boyfriend, appellant Jonathan Brice. Brice initially told responding officers that someone driving by in a black car shot Recara. But after the officers discovered a spent shell casing inside the apartment—evidence inconsistent with a drive-by shooting—Brice claimed Recara accidentally shot herself. Upon further questioning, Brice again changed his description of the incident, claiming he and Recara were "playing" with a gun and pulled the trigger together. Brice said he thought the gun's thumb safety was on when they pulled the trigger, and Recara's death was an accident.

The district attorney charged Brice with second degree murder. At trial, the prosecution theorized Brice acted with express malice, intentionally killing Recara because she recently had attempted to evict him from the apartment after she caught him cheating. The prosecution further theorized that, at a minimum, Brice acted with implied malice by consciously disregarding the risk to Recara's life when he pulled the gun's trigger. The jury convicted Brice, and the trial court sentenced him to 55 years to life in prison.

Brice now asks us to reverse his murder conviction. He contends insufficient evidence supports the verdict and insists the court erred by failing to instruct the jury on the elements of involuntary manslaughter committed during misdemeanor brandishing of a firearm. Alternatively, he argues the court abused its sentencing discretion by declining to strike his two prior "Three

_____

[1] Before the trial court, the parties referred to Recara by her first name. We do the same to avoid confusion.

Strikes" law (Pen. Code,[2] §§ 667, subds. (b)-(j), 1170.12) "strike" convictions for armed robbery and by imposing the 10-year high term on the firearm use enhancement charged against him.

We conclude, however, substantial evidence supports the murder conviction, the court did not err in failing to instruct on involuntary manslaughter because no substantial evidence supports that Brice brandished the gun, and Brice fails to demonstrate sentencing error.  Accordingly, we affirm.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

We summarize only the facts and procedural history relevant to our resolution of this appeal.

### A.    *The Shooting and Brice's Arrest*

In March 2022, Brice and Recara, who had been dating for several years, lived together in an apartment on Hyde Street in Los Angeles.  Mason, Recara's then five-year-old son from a prior relationship, and Dejanique Leavy, Mason's godmother, also lived at the apartment and shared a bedroom.  Asia Collins, Leavy's godsister, was staying at the apartment temporarily.

Around 10:30 p.m. on March 29, Leavy was at the laundromat, but Brice, Recara, Collins, and Mason were at the apartment.  Collins was supervising Mason in the bedroom he shared with Leavy.  The bedroom door was slightly ajar.  Although Collins could not see Brice or Recara, she heard Recara laugh and say, "Stop, Jonathan [Brice].  Open the door."  Several minutes later, Collins heard a gunshot.  She ran out of Mason's room to find Recara lying on the ground, partially outside the front door of the

---

[2] Unless otherwise specified, subsequent statutory references are to the Penal Code.

3

apartment, bleeding from a gunshot wound. Brice was standing over Recara, and he appeared to be feeling for her pulse.

Collins immediately called 911, but handed the phone to Brice so he could give the dispatcher the apartment's address. Brice told the 911 dispatcher that Recara had been the victim of a drive-by shooting. Collins testified she also heard Brice say, once or twice, "She made me do it."

Los Angeles Police Department (LAPD) Officer Keoni Smith responded to the scene. Officer Smith's body-worn camera captured Brice repeating his claim that someone in a passing car had fired the shot at Recara. The camera also captured Officer Smith moving a sofa to block Recara's body from view, in the event Mason left his room. When Officer Smith did so, he discovered a shell casing for a spent round underneath the sofa, which suggested to him "that the shooting or a shooting happened inside the apartment itself." The shell casing "change[d the] course" of Officer Smith's investigation, and after swabbing Brice's hands for gunshot residue, police took him into custody.

The day after the shooting, homicide detectives interviewed Brice. Initially, Brice told detectives Recara accidentally shot herself with a model 1911 firearm she had acquired on her own. Brice said he knew it was a 1911 because he frequented firing ranges (including on the day of the incident) and had some familiarity with guns. He explained: "[W]ith this 1911, I've seen it before, so I know it's kind of tricky. And I showed [Recara] that's the safety that's off. . . . [S]afety . . . down is live. So she kept playing with it and playing with it and I told her to stop. You['re] going to accidentally shoot me or yourself. I kept on telling her that." Then, the gun went off, and "[s]he went straight down."

When detectives asked where the gun was, Brice said he hid it in his car before officers arrived on the scene because he was

4

on parole.  And he said he reported the incident as a drive-by shooting because he "[knew] how it was going to look[,] and . . . didn't want to report it as a suicide because that's not really what it was.  It was really an accident."

Later in the interview, however, Brice changed his description of the shooting.  First, he admitted he "grabbed" the gun at some point during the incident, although he maintained Recara alone pulled the trigger.  Then, upon further questioning, Brice told detectives he and Recara were "playing" with the gun and they both pulled the trigger:

"[Brice]:  So like I said, I had closed the door on [Recara].  And she came and knocked.  And I was like, '[w]e're not buying nothing you['re] selling,' and we were sitting there laughing.  So I opened the door for her.  She was standing in the doorway and we were still playing, and I still had [the gun] in my hand.  And it accidentally went off.

"[¶] . . . [¶]

"[Detective]:  And were you upset?  I mean, what happened?

"[Brice]:  It was just shock.  We shouldn't have even been playing with it.

"[Detective]:  I mean, I want you to break it down.  Because you say, '[p]laying,' and playing means a plethora of things, right?  I want to know what happened right before the gun went off.  Where was she standing?  What were you guys doing?  Were you guys tugging on the door?  Were you guys exchanging words?  What happened before that gun went off?

"[Brice]:  So she was standing in there and we were tugging on each other.

"[Detective]:  She was pulling on you, you were pulling on her?

"[Brice]:  Yeah, but we were playing.

"[Detective]: Arms, shirts, hair, what was it?

"[Brice]: No, a shirt and then her dress. So we were just sitting there playing. And in my mind, I thought the safety was on. It wasn't.

"[Detective]: So you pressed the trigger to scare her?

"[Brice]: No, we kind of did it at the same time.

"[Detective]: What do you mean?

"[Brice]: So it was pointed at her and she was like, 'Oh, it's not going to shoot me, it's not going to shoot me.' And I said, 'I know,' because the safety was on. So we both pushed it at the same time and it went off. And it was just shock after that.

"[Detective]: So she pushed the trigger too?

"[Brice]: Along with me."

Finally, Brice claimed he had not cheated on Recara within the last year and denied saying, "She made me do it," in the aftermath of the shooting.

## B.   *The Trial*

The district attorney charged Brice with second degree murder (§ 187, subd. (a)) (count 1), willful discharge of a firearm in a grossly negligent manner (§ 246.3, subd. (a)) (count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1) (count 3)). The operative information further alleged enhancements for firearm use (§ 12022.5, subd. (a)) on counts 1 and 2, inflicting great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)) on count 2, and being "armed" with a firearm (§ 12022, subd. (a)(1)) on count 3. The information also alleged that Brice had suffered two prior strike convictions for armed robbery.

At the April 2024 trial, the prosecution argued Brice committed the murder with both express malice (i.e., the intent

to kill) and implied malice (i.e., a conscious disregard for life). (See *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)

In support of the express malice theory, Collins, Leavy, and Margo McClodden, Recara's sister, each testified that Recara had caught Brice cheating a week or two before the shooting. Recara then "tried to get the police to come" to evict Brice from the apartment, which Recara held in her name. According to Leavy, Brice said that if anyone attempted to "clear his belongings out [of] the house[, . . . ] he was going to shoot the house up." Leavy testified on cross-examination that, notwithstanding the threat, she attempted to remove Brice's belongings from the apartment. Leavy also testified that she heard Brice and Recara engage in physical and oral fights once a week, although she had never seen Recara with any resulting injuries. Finally, Collins testified concerning her observations of the immediate aftermath of the shooting, including that she heard Brice say, "She made me do it." The prosecution argued this evidence, along with the circumstances of the shooting and Brice's inconsistent descriptions of the incident, demonstrated he intended to kill Recara.

In support of its implied malice theory, the prosecution offered several categories of evidence supporting that (1) Brice pulled the trigger of the loaded 1911 firearm while it was pressed against Recara's chin, and (2) in doing so, Brice consciously disregarded the risk to Recara's life. To prove Brice participated in firing the fatal shot, a criminalist testified that both of Brice's hands (along with Recara's hands and face) tested positive for gunshot residue. In addition, Officer Smith testified about his discovery of the spent shell casing inside the apartment, and the prosecution played footage of the incident scene from his body-worn camera. The prosecution also played the video of Brice's interview, in which he admitted to pulling the gun's trigger. And the medical

7

examiner testified Recara had sustained a fatal "contact gunshot wound" to her chin, "mean[ing] that the muzzle of the weapon was in contact with [Recara's] skin when the weapon was discharged."

To prove Brice understood and consciously disregarded the risk to Recara's life posed by his conduct, the prosecution relied on the portions of Brice's interview in which he described his familiarity with the 1911 and claimed he repeatedly warned Recara of the dangers of mishandling it. In addition, LAPD Homicide Detective Louis Garcia testified to several facts supporting that Brice was the owner of the gun and thus presumably familiar with its operation: Analysis of the gun's serial number revealed it was stolen, video footage captured Brice purchasing a holster molded specifically to fit a 1911 firearm, a photograph depicted Brice wearing a holster, and officers recovered the gun, the holster, and the receipt for the holster from Brice's car. The gun, photograph, holster, and receipt all were admitted into evidence.[3] Finally, Detective Garcia testified the 1911 had three safety features designed to prevent accidental discharge: (1) the gun can fire only when the hammer is back, (2) the gun can fire only when the thumb safety is flipped down, and (3) the gun is equipped with a grip safety and therefore "will not shoot even if the safety is off and the hammer is back," unless a person holds the gun "in the proper shooting position." He further testified that "all [Brice] had to do to determine if the safety was on was just to look at the gun."

In response, the defense argued Recara's death was "an extremely foolish, possibly preventable, but nonetheless veritable accident." The defense called only one witness: a crime scene

---

[3] Certain trial exhibits are missing from our record on appeal. Pursuant to Evidence Code section 452, subdivision (d)(1), we take judicial notice of all the trial exhibits on our own motion.

8

reconstruction expert who testified "the 1911's are known for, if you drop the gun, it can go off." The expert further testified that if two people were pulling the 1911's trigger, the force required to shoot would be "very, very minimal." In addition, he opined that a person could avoid the need to manually cock the gun's hammer before firing by activating its chamber. But he agreed on cross-examination there are "three safety mechanisms on the 1911—the hammer, the thumb safety, and the grip safety," and "all three have to be in the correct position for the gun to fire."

At the close of evidence, the court instructed the jury on the elements of both express and implied malice murder using form instruction CALCRIM No. 520. Brice did not request, and the court did not provide, any instruction on involuntary manslaughter. The jury convicted Brice on all counts and found true all charged enhancements.

### C. *Sentencing*

At the May 20, 2024 sentencing, Brice made a *Romero* motion (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) requesting that the court strike his two prior strike convictions for armed robbery. After noting it "ha[d] read and considered [Brice's] prior criminal history, the charges and the two prior strike convictions, . . . [and Brice's] age at the time the prior strikes were . . . committed," the court denied the motion. It concluded Brice fell within the spirit of the Three Strikes law "based on [his] criminal history" and because "[a]ttempts at rehabilitation had failed."

The court likewise declined to strike the section 12022.5 firearm enhancement on count 1, electing to impose the 10-year high term "based on the nature of the offense, the testimony that the court heard during trial[, and Brice's] prior criminal record."

9

The court further commented: "The court is aware of its discretion to strike the gun enhancement. The court chooses not to exercise any discretion to strike the gun enhancement."

Accordingly, the court imposed a total term of 55 years to life on the second degree murder charge in count 1. On count 2, the court imposed a 21-year prison term, but stayed imposition of the sentence under section 654. Finally, the court sentenced Brice to seven years in prison on count 3, but ordered the term to run concurrently to the term on count 1.

Brice timely appealed.

## DISCUSSION

### A.  *Sufficient Evidence Supports the Murder Conviction*

Brice contends we must overturn his murder conviction because the trial evidence does not support that he acted with express or implied malice. He urges "substantial evidence supports only an accidental or negligent killing." (Boldface & capitalization omitted.) We are not persuaded.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).)

Substantial evidence supports that Brice acted with express malice—i.e., the intent to kill. (See *Smith*, *supra*, 37 Cal.4th

10

at p. 739 ["[i]ntent to unlawfully kill and express malice are, in essence, 'one and the same' "].) Although Brice insists he "had no motive," the prosecution offered substantial evidence of motive: Collins, McClodden, and Leavy testified Recara recently had attempted to evict Brice from her apartment after she caught him cheating. Leavy further testified Brice threatened "to shoot . . . up" the apartment if anyone tried to remove his belongings. And Collins testified she heard Brice say, "She made me do it," immediately following the shooting.

In addition, evidence concerning the 1911 firearm's three safety features (the hammer, the thumb safety, and the grip safety) supports that Brice discharged the weapon intentionally. Detective Garcia and the defense crime scene reconstruction expert agreed the gun could fire only with all three safety mechanisms in the correct position. Detective Garcia further testified a person need only visually inspect the gun to determine whether the thumb safety was engaged. Finally, the evidence—in particular, the holster and Brice's statements to detectives—supports that Brice owned the 1911 and was aware of its safety features.

Substantial evidence also supports the prosecution's alternative theory that Brice acted with implied malice—i.e., "a conscious disregard for life." (*Smith*, *supra*, 37 Cal.4th at p. 739.) Brice's own statements support that he understood the risk involved in pointing a loaded firearm at a person's face and pulling the trigger. Brice told detectives he was familiar with firearms generally and visited firing ranges. And he claimed he warned Recara repeatedly not to "play" with the 1911. On appeal, Brice insists the jury should have afforded greater weight to his statement to detectives that he believed the gun's thumb safety was on when he pulled the trigger. But "[w]e do not reweigh the evidence" when assessing whether it sufficiently supports a

11

criminal conviction. (*People v. Icke* (2017) 9 Cal.App.5th 138, 147.) Rather, "we 'view the evidence in the light most favorable to the jury verdict.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

Accordingly, we reject Brice's challenge to the sufficiency of the evidence supporting his conviction for second degree murder.

**B.     *The Trial Court Did Not Err by Failing to Instruct on Involuntary Manslaughter***

We likewise reject Brice's argument that the court erred by failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter.

"The unlawful killing of a human being without malice . . . [¶] . . . [¶] . . . in the commission of an unlawful act, not amounting to a felony" is involuntary manslaughter. (§ 192, subd. (b).) Brice insists that "[h]ad [the jury] been instructed on the misdemeanor theory of involuntary manslaughter, [it] could have easily and reasonably concluded that [Brice] killed Recara unintentionally in the course of committing, under circumstances dangerous to human life, the misdemeanor of brandishing a firearm."

"Under California law, trial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.) "But 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . .' [Citation.] '[S]uch instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury,' i.e., ' " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Gana* (2015) 236 Cal.App.4th 598, 606 (*Gana*); see *People v. Breverman* (1998) 19 Cal.4th 142,

12

162, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 (*Schuller*).)

"To support an instruction on involuntary manslaughter based on brandishing a firearm there [must] be evidence [the] defendant 'dr[e]w or exhibit[ed] a[ ] firearm . . . in a rude, angry, or threatening manner.' " (*Gana, supra*, 236 Cal.App.4th at pp. 606-607, citing § 417, subd. (a)(2).)  And as relevant here, "[c]ases holding the evidence supported a brandishing charge involve scenarios where the crime was preceded by a quarrel or confrontation between the participants." (*Gana, supra,* at p. 607; see *People v. Lee* (1999) 20 Cal.4th 47, 61 [trial court erred in failing to instruct on misdemeanor manslaughter form of involuntary manslaughter where the "defendant used his gun in the quarrel" with his wife that resulted in her death], implicitly disapproved on another ground in *Schuller, supra*, 15 Cal.5th at p. 260, fn. 7.)

Providing no record citations, Brice makes the conclusory assertion that his "interaction" with "Recara involved their quarreling over [his] infidelity" in addition to "their playfulness shortly before the shooting."  Nothing in the record, however, supports that Brice and Recara argued immediately before the incident.  To the contrary, Collins testified she heard Recara laughing several minutes before the shooting.  And Brice himself told detectives he and Recara were "playing" when the gun discharged.  Thus, no substantial evidence supports that Brice "brandished" the weapon.

Nor does any substantial evidence support that Brice acted "without malice." (§ 192.)  Rather, overwhelming evidence supports that Brice acted with at least implied malice by consciously disregarding the risk to Recara's life.  As set forth, *ante*, Brice's own statements to detectives evidenced his familiarity with guns in general and the 1911 firearm in particular.  Indeed, he claimed he

13

warned Recara repeatedly of the dangers of mishandling the loaded gun immediately prior to the incident. And he told detectives he nonetheless aided Recara in pulling the gun's trigger with its barrel pointed at her. Although Brice told detectives he mistakenly believed the gun's thumb safety was on, he also claimed he explained to Recara how to determine whether the safety was engaged: "I showed [Recara] that's the safety that's off. . . . [S]afety . . . down is live." Finally, the defense offered no evidence rebutting Detective Garcia's testimony that "all [Brice] had to do to determine if the safety was on was just to look at the gun."

We therefore conclude Brice fails to demonstrate the court erred by not instructing on involuntary manslaughter.

## C.   *Brice Fails to Demonstrate Sentencing Error*

Alternatively, Brice contends "the trial court abused its discretion by imposing a third strike term and an upper term firearm enhancement without considering public policy and legislation intended to ameliorate lengthy sentences and whether [he] would remain a public safety risk far into the future." Although Brice fails in his appellant's brief[4] to separate his sentencing challenge into its constituent parts, we understand his challenge as raising three distinct arguments. We address, and reject, each in turn.

First, Brice contends the court abused its discretion under section 1385 by refusing to strike the 10-year firearm enhancement or impose a lesser enhancement. Section 1385, subdivision (c) provides, in relevant part, that the presence of certain enumerated mitigating circumstances "weighs greatly in favor of dismissing [a sentencing] enhancement, unless the court finds that dismissal

---

[4] Brice filed no reply brief on appeal.

14

of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).)

Brice contends four such mitigating circumstances are present in his case: (1) "[t]he enhancement is based on a prior conviction"—here, Brice's two prior strike convictions—"that is over five years old" (§ 1385, subd. (c)(2)(H)), (2) "[m]ultiple enhancements are alleged in [Brice's] case" (*id.*, subd. (c)(2)(B))— namely, the prior strike convictions and the firearm enhancement,[5] (3) "[a]pplication of the enhancement would result in a discriminatory racial impact" (*id.*, subd. (c)(2)(A)), and (4) "application of [the] enhancement could result in a sentence of over 20 years" (*id.*, subd. (c)(2)(C)). Although Brice failed to raise any of these mitigating circumstances before the trial court, we exercise our discretion to consider them now. (See *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 227, fn. 9 [appellate court has discretion to review forfeited sentencing-related claims].)

The first two mitigating circumstances Brice identifies are not present because, contrary to Brice's contention, prior strikes are not "enhancements" for purposes of section 1385, subdivision (c). (See *People v. Dowdy* (2024) 107 Cal.App.5th 1, 9 ["[i]t is well established . . . that section 1385, subdivision (c) applies by its terms to a sentence 'enhancement,' but not to a sentence derived from the alternative scheme of the Three Strikes law"]; *People v. Burke* (2023) 89 Cal.App.5th 237, 244 ["[t]he plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement"];

---

[5] Brice does not argue we should consider the enhancements charged on counts 2 and 3 for purposes of our analysis here. As set forth, *ante*, the court stayed the term on one of those enhancements and ordered the term for the other enhancement to run concurrently to Brice's 55-year-to-life sentence on count 1.

see also *People v. Walker* (2024) 16 Cal.5th 1024, 1029, fn. 2 (*Walker*) [declining to address the issue, but noting that several appellate courts "have concluded that section 1385, subdivision (c), by its terms, only applies to enhancements and not the 'Three Strikes' law, which is an alternative sentencing scheme"].)

As to the third mitigating circumstance, discriminatory racial impact, Brice cites no evidence or specific authority supporting its presence here. Rather, Brice merely asserts "it appears" he received "a longer and more severe sentence" than "other similarly situated recidivist offenders" because of his "African American race." Brice therefore has forfeited this argument. (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672 ["[i]f an argument in an appellate brief is supported by only an opinion or argument of appellant's counsel without 'citation to any recognized legal authority,' that argument may be deemed waived"].)

Finally, as to the fourth mitigating circumstance, Brice makes no attempt to distinguish *People v. Torres* (2025) 113 Cal.App.5th 88, which held that subdivision (c)(2)(C) of section 1385 does not apply where, as here, a defendant's sentence "already exceed[s] 20 years without any enhancement." (*Torres, supra*, at p. 93, review den. Oct. 1, 2025, S292624.) Moreover, even if we disregard *Torres* and assume the mitigating circumstance is present, the circumstance does not "weigh[ ] greatly in favor of dismissing the enhancement" if the court finds that dismissal would endanger public safety. (§ 1385, subd. (c)(2); see also *Walker, supra*, 16 Cal.5th at p. 157.) And as set forth, *post*, to the extent the court made such an implicit finding in this case, the record supports that finding.

We therefore conclude Brice fails to demonstrate the court abused its discretion by declining to strike the 10-year firearm enhancement or impose a lesser enhancement.

Second, Brice contends any implicit finding by the court that dismissing the firearm enhancement would endanger public safety "is unsupported by the evidence." Brice does not dispute that the circumstances of Recara's murder (committed while Brice still was on parole and formal probation for other offenses), as well as his prior armed robbery convictions, provide support for such a finding. Rather, he contends the court erred "by relying *solely* upon the immutable facts of [his] current crime and his two prior robberies to speculate or 'predict' that he would remain dangerous for a minimum of 55 years, without considering any other facts in the record, such as the possibility of his rehabilitation and good conduct in prison, and most significantly, the current research showing that lengthy sentences do not improve public safety and recent legislation disfavoring imposition of enhancements resulting in excessive sentencing and prison overcrowding."

Brice, however, ignores the court's express finding that his prior "[a]ttempts at rehabilitation had failed"—a finding Brice does not challenge on appeal. Brice likewise ignores that (1) he failed to raise any argument concerning current research on sentence length before the trial court, and (2) absent an affirmative indication to the contrary, we generally presume a trial court was aware of recent legislation and followed applicable law. (*People v. Coleman* (2024) 98 Cal.App.5th 709, 725 ["[w]e assume the trial court was aware of and followed applicable law"]; see also *People v. Gonzalez*, *supra*, 103 Cal.App.5th at p. 227 ["[S]ection 1385, subdivision (c)(2) 'does not require the trial court to consider any *particular* factors in determining whether "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." ' [Citation.]")

17

Therefore, to the extent the court made an implicit finding that dismissing Brice's firearm enhancement would endanger public safety, we conclude the record supports the finding.

Third, and finally, Brice contends the court abused its discretion by "arbitrar[il]y" denying his *Romero* motion. (*See People v. Carmony* (2004) 33 Cal.4th 367, 371 [appellate court reviews denial of *Romero* motion "under the deferential abuse of discretion standard"].) In support of this contention, Brice argues the court failed to consider "the research guiding [former Los Angeles County District Attorney George] Gascón's and the Legislature's sentencing reform policies intended to alleviate extreme sentences, prison overcrowding, and the attendant crushing costs to the state." But Brice identifies nothing affirmative in the record demonstrating the court disregarded this legislative intent or relevant law. And "[w]here the record in silent" in " 'a post-*Romero* case,' " we presume the court correctly applied the law. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) Moreover, Brice ignores that in December 2024, newly elected Los Angeles County District Attorney Nathan Hochman issued special directives rescinding certain directives implementing former District Attorney Gascón's sentencing reform policies.[6] Brice identifies no relief this court may provide based on a now revoked policy of the former Los Angeles District Attorney.

We therefore conclude Brice fails to demonstrate sentencing error.

Accordingly, we affirm.

---

[6] On our own motion, we take judicial notice of Los Angeles County District Attorney Nathan Hochman's Special Directives 24-04 and 24-05. (See Evid. Code, § 452, subd. (c) [authorizing judicial notice of "[o]fficial acts of the legislative, executive, and judicial departments . . . of any state"].)

18

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.