Filed 1/19/21  P. v. Mazen CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANK MAZEN,<br><br>    Defendant and Appellant. | B300193<br>(Los Angeles County<br> Super. Ct. No. TA143638) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Scott A. Taryle, Supervising Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Frank Mazen appeals from a judgment of conviction after he was charged and convicted by jury of one count of first degree

murder (Pen. Code, § 187, subd. (a)),[1] and after the jury found true that defendant personally used a deadly and dangerous weapon, a car, during the murder (§ 12022, subd. (b)(1)).  On appeal from the judgment, defendant contends the trial court erred when it refused to instruct the jury on the defense of unconsciousness, which defendant asserts was supported by substantial evidence.  Defendant also contends that the prosecutor committed misconduct by asking defendant argumentative questions during cross-examination.

We conclude that defendant forfeited his argument regarding prosecutorial misconduct, which also fails on the merits.  We further conclude that the evidence did not warrant an unconsciousness instruction.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Prosecution Evidence*

A. *Defendant Fights with Mario*

Brandon Melbourne testified that around 8:00 p.m. on July 24, 2017, his brother, Mario Melbourne,[2] drove Brandon and Mario's girlfriend, Quiara Wallace, to an internet café, which was also the site of illegal gambling.  Mario worked as security at the café.

Around 9:30 p.m., defendant appeared at the café under the influence of methamphetamine.  Brandon told defendant, who Brandon

---

[1] Undesignated statutory references are to the Penal Code.

[2] For ease of reading, we refer to Mario and Brandon by their first name.

2

viewed as family, that he was not welcome.[3]  When defendant persisted, Mario walked to the front door of the café and punched defendant in the face.

A fistfight ensued, starting at the front door of the café, moving to the sidewalk and then street area near Mario's parked car.  Brandon watched as Mario punched defendant in the face a few times before defendant fell to the ground, after which Mario placed defendant in a headlock.

When defendant, "tapped out," Mario released him.  Brandon heard defendant repeatedly yelling, "I got you, Mario.  I got something for you.  All right.  All right," as he walked to his car.

B.      *Defendant Hits Mario with His Car*

Defendant got into his car, and drove off, sideswiping Mario's car. He then stopped his car at a nearby intersection, made a three-point turn, and drove back toward the café.  Mario, who had been walking toward defendant's car, was in the street.

Wallace exited the café and stood on the sidewalk with Brandon, and saw Mario approach defendant's car.  Mario pulled on the driver's side door handle, which had been locked, and struck the windows with his hands.  Wallace testified that defendant backed up his car and drove forward a few times, causing Mario to dodge the vehicle to avoid getting hit.  Wallace believed defendant's maneuvers were attempts at hitting

---

[3]      The owner of the café instructed Brandon and Mario not to let defendant inside the café.

Mario, who responded by striking the car windshield and stabbing the front tires with his pocketknife.

When Wallace told Mario she wanted to leave, Mario walked over to where she was standing. Having backed up his car onto the opposing sidewalk, defendant revved the engine and drove directly toward Mario, Wallace, and Brandon. As Brandon and Wallace ran down the sidewalk away from defendant's car, Brandon saw Mario run to the front of his car a few feet away.

Brandon saw defendant's car maneuver back into Mario's direction before it crashed into him, pinning Mario between the bottom front end of Mario's car and defendant's front bumper. Following the collision, defendant backed up his car and drove away. Paramedics arrived shortly thereafter and told Brandon that Mario was dead.

The morning after the incident, Sergeant Guillermo Morales, the investigating officer in this case, located defendant's car on a nearby street. Morales testified that the windshield had been smashed, the right front tire was flat, and the front bumper was covered with blood. A criminalist testified that Mario's DNA matched a profile collected from a bloodstain on the front grill of defendant's car. Ten days after the incident, defendant surrendered himself to police.

2.    *Defense Evidence*
    A.    *History of Epilepsy*

4

Defendant's stepdaughter, Kyra Trotter, testified that defendant had been taking medication for recurring seizures for approximately 20 years. According to Trotter, defendant would become dizzy and disoriented before having a seizure, and would lose control of his limbs during a "full-blown" seizure. Trotter believed defendant could drive during a pre-seizure dizzy spell, but could not drive during a full-blown seizure.

Neurologist Dr. Robert Freundlich examined scans of defendant's brain, and opined that defendant was at high risk of having epilepsy. According to Dr. Freundlich, persons who experience generalized seizures lose consciousness and fine motor skills. A generalized seizure is distinct from the stage preceding a seizure, sometimes called an "aura," in which the person remains fully conscious, does not lose motor control, and may experience a feeling of déjà vu.

Testifying in his own defense, defendant admitted that while he suffers from epilepsy, he was not having a full-blown seizure during the incident. Defendant felt "woozy" and "dreamy" after the fistfight, and believed that if he did not calm down, he would have a "dreamy" state rather than a generalized seizure. Defendant admitted that his epilepsy had nothing to do with what happened to Mario.

B. *Defendant's Description of the Incident*

Defendant testified that after the fistfight with Mario, defendant walked to his car to "calm" himself, sitting inside the car for 30 to 45 seconds before he backed up the car in an attempt to drive away. When he sped off, defendant accidentally sideswiped Mario's car before

reaching a nearby intersection, where he executed a three-point turn to face his car back toward the café.[4]

Before defendant could drive past the café, Mario ran into the street, pulling on the car door handles, banging on the windows, and threatening to kill defendant. Defendant steered his car to the right to get away, but Mario switched to the other side of the car and began stabbing his tires with a knife. Defendant backed up and drove forward a few times to get around Mario.

When defendant found a clear escape route, he accidentally shifted the car into neutral, which caused him to rev the engine. After placing the car back into drive, defendant drove forward with difficulty, as his front tire had been flattened by Mario.

When defendant's car hit the sidewalk curb, Mario quickly moved into the street and blocked defendant's car moments before defendant crashed into Mario's car. Unaware he had pinned Mario between both cars, defendant backed up and sped away before abandoning his car in a nearby street.

The next day, defendant learned Mario had died during the incident. Defendant turned himself into police custody 10 days after the collision so that he could relocate his family to protect them from retaliation by Mario's family and friends.

---

[4]    Defendant testified that he turned his car around because he wanted to drive on a busier street.

3. *Prosecution Rebuttal*

The prosecutor recalled Sergeant Morales to testify and played portions of an interview he had with defendant on August 3, 2017. During the interview, Morales asked defendant whether he was having a seizure during the incident. Defendant responded that he felt a seizure coming on, but did not say that he was having a seizure. Defendant also recalled maneuvering his vehicle to avoid hitting Mario or anyone else with his car—"Every time he's getting on it I'm trying to go to the opposite of where he's going."

4. *Verdict and Sentencing*

The jury found defendant guilty of first degree murder (§ 187, subd. (a)), and found true the special allegation that he personally used a deadly and dangerous weapon, a car, during the commission of the murder (§ 12022, subd. (b)(1)). In a bifurcated proceeding, defendant admitted he had suffered one prior conviction for a serious felony (§ 667, subd. (a)), and two prior serious or violent felony convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

After dismissing one of defendant's prior strikes and one serious felony conviction, the court sentenced defendant to an overall term of imprisonment of 56 years to life.[5] Defendant filed a timely notice of appeal.

---

[5] The court also imposed and stayed various fines, fees, and assessments, based on a stipulation of defendant's inability to pay.

## DISCUSSION

1. *The Court Was Not Required to Instruct on the Defense of Unconsciousness*

After the close of evidence, defense counsel requested an instruction on the defense of unconsciousness (CALCRIM No. 3425).[6] Finding insufficient evidence supported the instruction, the court denied counsel's request. On appeal, defendant asserts the trial court erred when it refused to give the instruction. We disagree.

### A. *Governing Law*

"In general, a trial court must give a requested jury instruction if there is substantial evidence in the record supporting such an instruction." (*People v. Mitchell* (2019) 7 Cal.5th 561, 583.) Substantial evidence in this context is evidence that, if credited, was sufficient to support the defense. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "'"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]'" [Citations.]" (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

---

[6] CALCRIM No. 3425 provides, inter alia, that a defendant is not guilty of a crime if he or she "acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [¶] Unconsciousness may be caused by a blackout, or an epileptic seizure, or involuntary intoxication."

8

"'Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge.' [Citations.]" (*People v. Parker* (2017) 2 Cal.5th 1184, 1223; see also § 26, class Four.) "'Unconsciousness for this purpose need not mean that the actor lies still and unresponsive,'" but can exist "'"where the subject physically acts in fact but is not, at the time, conscious of acting."'" [Citations.]" (*People v. Gana* (2015) 236 Cal.App.4th 598, 609 (*Gana*).) We presume that a person who acts in an apparent state of consciousness is in fact conscious. (*People v. James* (2015) 238 Cal.App.4th 794, 804.)

B.  *Analysis*

Defendant contends that his own testimony and that from Dr. Freundlich constituted substantial evidence to support his requested jury instruction on unconsciousness. We are not persuaded.

The testimony identified by defendant establishes only that defendant's dizziness was a symptom of an "aura" or preseizure state. According to the evidence presented, persons experiencing an aura remain fully conscious and in control of their fine motor skills. In his own testimony, defendant denied that his epilepsy had anything to do with hitting Mario, and he recalled maneuvering the car to avoid hitting Mario. Defendant's account of what transpired forecloses any possibility that he was experiencing a generalized seizure. If anything, the evidence establishes that defendant was experiencing an aura in which he was aware of his conduct before, during, and after he drove into Mario and Mario's car.

The ability of defendant to recall each of his maneuvers in detail makes this case readily distinguishable from *People v. Bridgehouse* (1956) 47 Cal.2d 406, on which defendant relies.  (Compare *id.* at pp. 410, 412 [defendant testified he was unconscious during the time he pulled a gun and shot the victim, and could only recall the gun clicking on empty cartridges after the shooting].)  The other case on which defendant relies, *People v. Freeman* (1943) 61 Cal.App.2d 110, is also readily distinguishable, as here there was no evidence (expert or otherwise) that defendant lost consciousness at any point during the incident.  (Compare *id.* at p. 114 [four physicians testified that defendant lost consciousness due to epilepsy at the time he drove his car into the victim's vehicle].)  Indeed, Dr. Freundlich simply opined that defendant's brain damage rendered him at-risk of suffering from epilepsy, not that he was having a seizure during the incident.  Thus, insufficient evidence supported the instruction on unconsciousness.

C.    *Any Instructional Error Was Harmless*

Even assuming there was substantial evidence of unconsciousness (there was not), the error in refusing to instruct the jury "was harmless under either standard" of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818 or *Chapman v. California* (1967) 386 U.S. 18.  We reach this conclusion because the jury necessarily resolved the same factual question that would have been presented by the missing instruction against defendant.  (*People v. Wright* (2006) 40 Cal.4th 81, 99.)

10

To convict defendant of first degree murder, the jury was required to find beyond a reasonable doubt that defendant acted willfully, deliberately, and with premeditation. Those findings required that defendant intended to kill, carefully weighed considerations for and against his choice, and decided to kill before completing the acts causing death. (CALCRIM No. 521.) To assist the jury in making these determinations, the court instructed on the joint union of act and intent (CALCRIM No. 252), and the effects of defendant's mental disease or disorder on his mental state required for murder (CALCRIM No. 3428). Despite its ability to reduce the first degree murder charge based on an absence of express malice to a lesser included offense, it did not do so. (See *Gana*, *supra*, 236 Cal.App.4th at pp. 610–611; *People v. Maury* (2003) 30 Cal.4th 342, 422.)

The evidence of defendant's consciousness was also overwhelming. After sideswiping Mario's car, defendant executed a three-point turn to face his car back in the direction of Mario, Brandon, and Wallace. Defendant revved his engine and drove quickly toward Mario before pinning him between his and Mario's cars. The jury's single question on provocation during deliberations did not indicate that the jury was closely divided on the issue of defendant's consciousness.[7] (See *People v. Davis* (1995) 10 Cal.4th 463, 521–522 [the jury does not indicate it is

---

[7] The jury asked: "Please elaborate and clarify second degree murder. Please give examples of provaction [*sic*]." The court directed the jury to the following jury instructions: CALCRIM Nos. 500 [Homicide: General Principles], 520 [First or Second Degree Murder with Malice Aforethought], 521 [First Degree Murder], and 522 [Provocation: Effect on Murder].

having difficulty on a legal issue when it asks a question on a separate issue].) Thus, defendant's claim of instructional error is devoid of merit, and harmless under any standard of prejudice.

2.  *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by asking defendant argumentative questions during cross-examination. He focuses on 15 separate questions to which objections were sustained as argumentative before defendant could provide an answer.

Despite defense trial counsel's objections to these questions, counsel did not request an admonition from the court or request a mistrial. Because defendant has not established how an admonition could have cured any harm (*People v. Centeno* (2014) 60 Cal.4th 659, 663),[8] he has forfeited this claim on appeal. (*People v. Hoyt* (2020) 8 Cal.5th 892, 952; *People v. Peoples* (2016) 62 Cal.4th 718, 801; *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)

Moreover, the questions, even if improper, did not prejudice defendant. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 686.) To every question defendant has identified, the court sustained an objection as

---

[8]     Defendant's conclusory statement in the reply brief that "an admonition would not have helped, and [would] likely [have] made things worse" is contrary to the well-established principle that the jury would understand and follow an admonition to disregard the improper questions. (*People v. Bennett* (2009) 45 Cal.4th 577, 621.)

12

argumentative before defendant could provide an answer.[9]  In light of these rulings and the court's instruction to the jury that the attorneys' questions were not to be considered as admissible evidence (CALCRIM No. 222), we conclude that the questions, even assuming they were improper, do not amount to prejudicial misconduct.  (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors "are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"]; *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236 ["[a] party generally is not prejudiced by a question to which an objection has been sustained"] (*Johnson*).)[10]

//

---

[9]     The court overruled defendant's argumentative objection to the following question: "Would [accidentally placing the car in neutral] been important information to tell [Morales]?"  The court did not abuse its discretion when it overruled the objection.  The question sought to elicit relevant testimony regarding defendant's theory that Mario was hit by accident (CALCRIM No. 510).  (See *People v. Chatman* (2006) 38 Cal.4th 344, 384 ["[a]n argumentative question is a speech to the jury masquerading as a question" and does not seek to elicit relevant testimony].)

[10]     All of the cases on which defendant relies are either inapposite to this case or support our conclusion.  (See, e.g., *Johnson, supra,* 109 Cal.App.4th at p. 1236 [reversal not required after trial court sustained objections to improper questions, and defendant's answers were "short, direct and consistent with his protestations of innocence"]; *People v. Pinholster* (1992) 1 Cal.4th 865, 943 [no prejudice will be found when the court sustains an objection to the question, the witness does not answer, and the jury is instructed to disregard the attorneys' questions], overruled on another ground in *People v. Williams* (2010) 49 Cal.5th 405; *Hill, supra,* 17 Cal.4th at pp. 845–846 [prosecutor's pervasive conduct went beyond asking argumentative questions during cross-examination]; *People v. Duvernay* (1941) 43 Cal.App.2d 823, 826–828 [same]; *People v. Wagner* (1975) 13 Cal.3d 612, 618–619 [same].

13

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

CURREY, J.

14