Filed 9/10/25; Certified for Publication 10/2/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON JOEL CORTEZ,<br><br>    Defendant and Appellant. | H052179<br>(Santa Cruz County<br>Super. Ct. No. 19CR06615) |

After a jury convicted defendant Jason Joel Cortez of murder committed for the benefit of a criminal street gang, he was sentenced to life in prison without the possibility of parole. He challenges the sufficiency of the evidence that the murder was committed for the benefit of a criminal street gang; the trial court's exclusion of certain proffered defense evidence; the constitutionality of his life sentence; and the imposition of a parole revocation fine. For the reasons we will explain, we will affirm the judgment.

## I.    TRIAL COURT PROCEEDINGS

Defendant was charged with murdering German Carrillo in 2019, when both defendant and Carrillo were incarcerated at the Santa Cruz County jail. The murder was alleged to have been committed for the benefit of a criminal street gang, and defendant was charged in a second count with active participation in a criminal street gang.

### A. GANG EVIDENCE

A gang expert testified about the history and structure of Nuestra Familia, a prison gang that oversees and collects taxes from Norteño street gangs. According to the expert,

Nuestra Familia is characterized by a "militant organizational" structure under which three "generals" exercise control over the gang's members. Nuestra Familia gang members are divided into three hierarchical categories: "Cat 1, 2, and 3." A new member would begin as an "apprentice" in Cat 1 and could work up to Cat 3, which serves as a council or "government body" that assists the three generals in making decisions for the gang. Nuestra Familia members communicate with each other and with Norteño street gang members using "kites," which are very "small hand written notes" that can be smuggled, commonly in a body cavity, within or out of jails and prisons.

The expert testified that in 2019, Norteño gang members incarcerated at the Santa Cruz County jail were housed in certain units including the maximum-security N unit. Norteño inmates kept the unit clean and organized, and enforced strict rules in keeping with the "14 bonds" that all Norteños were expected to follow. The 14 bonds prohibit assaulting fellow Norteños (unless the assault is "preapproved" by gang leadership), as well as "snitching" or becoming an informant. When correctional officers entered the unit, the inmates would stop what they were doing and remain quiet until the officers left. A designated inmate would speak to correctional staff on behalf of the entire unit. For safety, correctional officers commonly worked in pairs rather than alone when performing tasks inside the N unit.

According to the expert, three cells in the N unit were known as "Cadillac" cells because they were large enough to house three inmates. Three other cells were considered more desirable by inmates because they were obstructed by concrete pillars, providing more privacy. Although inmates were assigned to certain cells by jail personnel, they sometimes changed cells without authorization, and jail personnel would sometimes simply note the changes without attempting to undo them. The three Cadillac cells often housed "new arrivals" or Norteños under investigation by the gang for suspected violations of gang rules; the three more private cells often housed Norteño authority figures.

2

A former Norteño gang member testified that punishment for violating gang rules could range from "writing an essay" to being killed. Senior Norteños would generally be punished more harshly than younger gang members. Serious violations (like violent attacks on fellow Norteños) could cause the offenders to be "deemed" or "get a green light on them," which would allow other members to attack and kill them with impunity. The gang has a system for enforcing its rules in the jail. Norteños suspected of violating the gang's rules "get put on freeze" while the allegations are investigated. The "frozen" member is followed by two "security blankets" who monitor his movements and ensure that he does not try to hurt anyone or leave the unit. The security blankets are expected to stab the individual if he makes any sudden movements. If the allegations are substantiated, he might be subject to "removal" from the unit. A removal involves a violent attack on the inmate found to have violated gang rules, resulting in either the person's death or transfer to a different unit of the jail. Removals are almost always carried out by multiple members, including two armed with sharp instruments. The witness testified that he had participated in a removal at a jail in Watsonville in March 2019 against a member accused of stealing drugs from fellow Norteños and selling them to other inmates. Shortly after the person was identified for removal, he was attacked by a team of two armed "strikers" and two "bombers" who provided backup. The intent of the attack was to kill the person, but the strikers' weapons were ineffective and the victim survived.

Another former Norteño testified that he had been the victim of a removal at the Santa Cruz County jail in July 2019. After learning that he had been accused of robbing someone associated with a high-ranking Nuestra Familia member, he unsuccessfully attempted to clear his name. One day, after fellow Norteño inmates made him exercise until his arms were exhausted, he began showering and was attacked by a group of fellow Norteños and stabbed in the chest. He fought back and escaped from the shower, at which point his attackers told him to push a panic button and "get the fuck out" of the

3

Norteño unit. One of his attackers also told him the attack was "nothing against you, homie, it's all business."

## B. THE DEATH OF GERMAN CARRILLO

In October 2019, defendant was sharing one of the N unit's Cadillac cells with German Carrillo and Mario Lozano. (The jail's official roster indicated that another inmate was assigned to that cell instead of defendant, but defendant had taken his place without permission from jail staff.) On October 12, a correctional officer noticed a pen "stuck on the locking mechanism" of the cell door and removed it. All three inmates were seen awake inside the cell that night.

At dinnertime on October 13, a correctional officer saw defendant and Lozano in the cell. Carrillo appeared to be sitting on his bunk with his back facing the cell door, and he did not turn around or say anything. Lozano was awake when correctional staff delivered breakfast to the cell on the morning of October 14; defendant and Carrillo appeared to be asleep in their beds.

After 7:00 a.m. on October 14, correctional officers began letting the N unit inmates out of their cells on a staggered basis. The officers attempted to let defendant and his cellmates out first, but inmates in other cells protested that they were scheduled to be let out first. At 9:46 a.m., an officer saw defendant (who "wasn't supposed to be out of his cell") "running up the stairs" to his cell and closing the door. Later that morning, a correctional officer noticed that Carrillo appeared to still be in bed which was unusual because the Norteño inmates in the unit typically woke up early. The officer asked Lozano if Carrillo was "okay," and Lozano shrugged. Two officers entered the cell and found Carrillo's body wrapped in a blanket. Carrillo's body was cold to the touch and unrecognizable. He appeared to have been beaten and there were "strangle marks around his neck and a few stab wounds." An autopsy later revealed that Carrillo had likely died from "ligature strangulation" sometime on October 13.

4

Correctional staff removed inmates from the unit and "lock[ed] down" several neighboring units. During that process, a Norteño inmate in another unit asked a correctional officer "what was going on, did they get the homie over in N unit." Another inmate from the N unit was at a nearby hospital, where he was receiving treatment under the supervision of a sheriff's deputy. When the inmate learned "N unit was placed on lockdown," he said, "Carrillo, I saw that coming."

Investigators searched the cell and found "a pen tip in the toilet bowl"; a piece of "fabric covering the door window"; and a piece of plastic "in the door latch of the cell." The toilet was clogged and overflowed on October 15. A plumber investigated the source of the blockage, removing a white bedsheet and a "piece of brown towel" from the pipes. No weapons were found. Investigators did not see any defensive wounds on defendant or Lozano, although photographs showed a "scab" on Lozano's thumb and "redness" around his knees.

Surveillance video showed Carrillo being followed around the unit by other inmates on October 11 and 12. No one other than defendant, Carrillo, and Lozano could be seen entering or leaving their cell on the night of October 12. Carrillo did not appear in any video footage from October 13 or 14. He was often left alone in the cell on those days with the door open and unguarded, whereas someone had always been near him on the previous two days. Defendant and Lozano could be seen moving in and out of the cell, as well as sweeping and mopping.

Four years later in September 2023, in a search of defendant's cell correctional officers found kites dating back to 2019. The kites indicated Carrillo had been investigated by gang authorities for using other inmates' accounts to make phone calls. In August and September 2019, after having initially denied the allegations, Carrillo paid back some money he admitted taking from other inmates' accounts. He was "placed on freeze" in September and "deemed" on October 10. On October 9, an encrypted message

5

was sent from the jail asking the recipient to deposit $100 into accounts belonging to defendant and Lozano; no such deposits appeared to have been made.

A detective determined from reviewing jail phone records and listening to recorded calls that Carrillo had used other inmates' accounts to call his sister and girlfriend on numerous occasions. A gang expert opined that Carrillo was killed for using his power and authority to steal from fellow Norteños, then lying about it during the gang's investigation. The expert also opined that in a hypothetical scenario based on the facts of the case, a removal would be carried out by at least two participants in order to ensure the attackers' safety. The hypothetical removal would benefit the gang by "inflicting the punishment on somebody that held a position of authority"; "weeding out the weak"; and bolstering the gang's reputation.

## C. DEFENSE EVIDENCE

### 1. Defendant's Testimony

Defendant testified that he had joined a Norteño street gang when he was about 12 years old and committed numerous gang-related offenses as a minor and young adult. He had been to prison twice and held several positions of authority within the gang during his second prison term. He had twice "been in trouble with the gang" while in prison but had resolved those situations by participating as a bomber in a nonfatal removal and paying a $1,000 fine.

Defendant and Carrillo were from the same neighborhood and were friendly with one another, but defendant had only briefly met Lozano before being housed in the N unit in 2019. Upon arriving in the unit, defendant was initially assigned to a different cell with different cellmates. In August or September 2019, another inmate asked defendant whether he would be willing to participate in a possible removal. Defendant agreed after being told the removal "probably wasn't going to happen." He did not know that Carrillo was the target or that Carrillo had been stealing money from other inmates.

6

About three weeks later, a high-ranking gang member told defendant he was being transferred to the Cadillac cell with Carrillo and Lozano in case the removal went forward. Defendant initially resisted the move but complied after being told it was an order. At that time, defendant knew Carrillo was "on freeze" but did not know the reason. Defendant and Lozano took turns monitoring Carrillo for about two weeks.

According to defendant, he woke up between 5:30 and 6:00 a.m. on October 13 and then went back to sleep. When he woke up again, he saw Lozano "strangling" Carrillo. Carrillo "didn't seem like he was putting up much of a fight." There was a "shank" on the floor and Lozano told defendant to flush it down the toilet, which he did. After Lozano finished killing Carrillo, defendant helped him put Carrillo's body on the bed and clean up the cell. Defendant claimed he had not expected Lozano to kill Carrillo and they had not discussed any plan to do so. He explained his demeanor at the time Carrillo's body was discovered (which one correctional officer had described as "nonchalant") by saying that he was trying to "survive" and did not want to show "weakness."

After the murder, defendant was transferred to several other units and spent time in segregated confinement. Lozano remained in the Norteño unit. Defendant was worried that his fellow Norteños might suspect him of "providing information to law enforcement" because of his transfer away from the unit, and that they might consider him a "coward" because he had not physically aided Lozano in the attack on Carrillo. He "reached out to a good influential friend within the organization" and received a response indicating that he was "all good" and would be "coming home soon." Months after the murder, he was returned to a Norteño unit and assumed a position of authority.

In June 2020, defendant learned why Carrillo had been killed. Defendant "felt angry" and was "in disbelief that an individual in charge would make such a call for such a petty offense." He left the gang about a month later. At some point, he met with the prosecution and provided information about the murder.

7

## 2. Other Defense Witnesses

A sheriff's deputy testified that defendant had been interviewed by the prosecution in August and November 2020.  Although such interviews were typically recorded and the recordings stored in an evidence database, no recording of the August interview was present in the database.

A defense attorney testified as an expert in criminal law that, at the time of the murder, defendant was facing unrelated gun charges carrying a maximum sentence of nine years and four months in prison.  In the attorney's opinion, defendant's likely sentence in that case would have been four years in prison.

A former juvenile correctional officer testified that defendant had twice participated in his "honor program" as a minor.  (The program served as an alternative to placement in juvenile hall.)  During defendant's second time in the program when he was probably 16 or 17 years old, the officer was seriously injured when he fell onto a floor coated with a strong chemical agent.  Defendant picked him up and carried him to safety.  The officer credited defendant with saving his life.

A former police officer testified that he had detained Carrillo in connection with a homicide investigation in 2013, when Carrillo was a minor.  The officer secretly recorded a conversation Carrillo had with another suspect in the back of a police car.  According to a transcript of the recording, Carrillo said, "I didn't get to break my phone or anything.  …  I could have gotten away with it.  I fucked up."

A gang expert testified that rank-and-file gang members would likely know if someone was "on freeze" but would be unlikely to know the reason for the freeze.  He opined that in a hypothetical scenario parallelling defendant's account of Carrillo's death, the gang member who witnessed the murder could face consequences for failing to participate and could seek assistance from high-ranking gang members he knew.

A criminalist testified that a DNA sample taken from one of Carrillo's fingernails contained a mixture of DNA from Carrillo and one other person.  She calculated it was

8

about eight times more likely that the DNA mixture came from Carrillo and a random individual than from Carrillo and defendant. It was five times more likely to have come from Carrillo and a randomly selected person than from Carrillo and Lozano.

### 3. Excluded Evidence

Defendant sought to rebut the prosecution's evidence regarding his "nonchalant" demeanor following the correctional officers' discovery of Carrillo's body. Defense counsel proffered to the trial court that defendant "is being treated for depression" and had "made a suicide attempt," and that his history of depression would explain his affect at the scene. The court ruled the suicide attempt was not relevant, but defendant "can say I was depressed and that's why [I] looked like that."

The trial court sustained the prosecutor's objections when defense counsel attempted to ask defendant whether he was "being treated for any mental health issues" or "taking medication" at the time of trial. When counsel later raised the issue outside the jury's presence, the court confirmed that defendant could say he was "depressed" but could not "talk about his psychiatric diagnosis."

### D. VERDICT AND SENTENCING

The jury found defendant guilty as charged and found the gang allegations true. The trial court sentenced defendant to life in prison without the possibility of parole for special circumstance murder, consecutive to a 10-year gang enhancement, and imposed a concurrent determinate sentence of two years in prison on count 2. The court-imposed fines and fees including a $5,000 parole revocation fine that was suspended unless and until parole was revoked.

## II. DISCUSSION

### A. SUFFICIENT EVIDENCE SUPPORTS THE JURY'S GANG FINDINGS

Defendant contends there was insufficient evidence to support a true finding on the gang special circumstance allegation because the prosecution failed to prove the two predicate offenses provided a non-reputational benefit to a criminal street gang. As the

9

Attorney General observes, defendant's argument applies with equal force to the special gang allegation attached to count 1 and the substantive gang offense charged in count 2. We consider and reject the argument with respect to all three uses.

Defendant's 2024 trial followed the enactment of Assembly Bill No. 333 (2021–2022 Reg. Sess.), which amended Penal Code section 186.22 to modify the elemental definitions of " 'pattern of criminal gang activity' " and " 'criminal street gang' " (Pen. Code, § 186.22, subds. (e), (f)), and to clarify what it means to "benefit, promote, further, or assist" a criminal street gang (Pen. Code, § 186.22, subd. (g); unspecified statutory references are to the Penal Code). (Stats. 2021, ch. 699, §§ 3, 4.) As relevant here, the amended statute requires that the predicate offenses must have commonly benefited a criminal street gang and the common benefit must have been more than reputational. (§ 186.22, subds. (e)–(g).) Qualifying benefits "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Given that the jury was properly instructed on the elements of the new law, we review its findings only for substantial evidence. (*People v. Shively* (2025) 111 Cal.App.5th 460, 468 (*Shively*).) Under that standard, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) To overturn the jury's finding, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

We note that published authorities applying the ameliorative amendments to section 186.22 retroactively are of limited utility here. Although some of those

10

authorities have reversed gang findings because the evidence could rationally have shown the predicate offenses provided only reputational benefit (see, e.g., *People v. Cooper* (2023) 14 Cal.5th 735, 739), the "sufficiency of the evidence review applicable in those cases is different from that which applies here, where the jury was instructed on the amended version of section 186.22." (*Shively*, *supra*, 1 11 Cal.App.5th at p. 468.) Both predicate offenses in this case involved assaults committed against gang members as punishment for perceived violations of gang rules. Defendant contends any benefit derived from those assaults was purely reputational, implying that the purpose of punishment is inherently reputational in nature. He does not explain how intra-gang punishment differs in that respect from "retaliation" or "targeting a perceived or actual gang rival," both of which are listed in the amended statute as benefits that may be considered "more than reputational" (and both of which involve violence against those whose actions or affiliations put them in conflict with the gang's perceived interests). (§ 186.22, subd. (g).) Nor does he distinguish offenses involving "financial gain or motivation," which is also listed in section 186.22, subdivision (g) as a potentially qualifying common benefit, from offenses committed to punish gang members specifically for perceived financial transgressions against the gang. (There is evidence that the victims of the predicate offenses were suspected of robbing or stealing from gang members or their associates.)

Defendant's argument relies primarily on *People v. Lamb* (2024) 16 Cal.5th 400 (*Lamb*). In *Lamb*, "although there was an abundance of gang evidence presented to the jury, and each predicate offense had a gang enhancement under a prior version of section 186.22, the record [did] not sufficiently disclose the circumstances surrounding the predicate offenses or how any specific predicate offense actually benefited the gang" to preclude the possibility that "a rational juror could have reasonably concluded that any common benefit was not more than reputational." (*Id.* at p. 445.) A gang expert "testified to his general belief that any crime committed by a gang member benefits the

gang" but "did not expound upon what crimes would benefit the gang, or how." (*Id.* at p. 450.) He "provided some more specific explanations as to how various crimes benefited the gang," but did so only through general testimony about certain hypothetical scenarios, and "the lack of evidence of the circumstances surrounding the predicate offenses at issue [did] not establish that they fit into any of those scenarios so as to preclude a jury from reasonably concluding that any common benefit was not more than reputational." (*Id.* at p. 451.) The expert also "repeatedly testified as to how an individual gang member could increase their status and respect *within the gang*"—from which "a juror could have concluded that the predicate offenses were committed to bolster the offender's reputation within the gang, or if committed alongside other gang members, that the offense provided the common benefit of increased status to each perpetrator." (*Id.* at p. 453.)

Despite those deficiencies, our Supreme Court suggested the evidence in *Lamb* may have been sufficient to establish a non-reputational benefit had the case been tried following the enactment of Assembly Bill No. 333 and the jury instructed on the elements of the amended statute. (See *Lamb*, *supra*, 16 Cal.5th at pp. 453 ["a rational juror may well infer that at least two of the predicate offenses were committed for a common benefit that was more than reputational"], 455 ["Were this a question of sufficiency of the evidence, the outcome might be different"].) The Supreme Court nonetheless reversed the gang findings because it could not conclude beyond a reasonable doubt that the jury would have found the predicate offenses provided a qualifying benefit, had the jury been asked to do so. (*Id.* at pp. 448–449, 454–455.) But as we have discussed, the jury in this case *did* make that finding, and our review is limited to whether its finding is supported by substantial evidence.

The evidence here is also stronger in some respects than the evidence in *Lamb*. Unlike in *Lamb*, there is case-specific evidence establishing the circumstances of the predicate offenses. There is also evidence that both predicate offenses fall within a

12

category of offenses (i.e., removals) from which a jury could reasonably infer that the offenses themselves benefited the gang. From the evidence presented here, a jury could rationally conclude beyond a reasonable doubt that both predicate offenses provided a common benefit to the gang that was more than reputational. Sufficient evidence therefore supports the jury's true findings on the special circumstance and special gang allegations attached to count 1, as well as the guilty verdict on count 2.

## B. THE EXCLUSION OF MARGINAL EVIDENCE DOES NOT REQUIRE REVERSAL

Defendant argues he was deprived of due process by the trial court's exclusion of certain proffered evidence relating to his mental health, which he asserts prevented him from rebutting the prosecution's evidence that he appeared nonchalant when Carrillo's body was found in his cell. We see no due process violation or reversible error in the court's exclusion of the evidence.

"As a general matter, the '[a]pplication of the ordinary rules of evidence … does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id.* at p. 1103.) Under state law, "only relevant evidence is admissible" and trial courts are vested with broad discretion to determine relevance. (*People v. Kelly* (1992) 1 Cal.4th 495, 523.) "The court's ruling will not be disturbed unless made 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Powell* (2018) 6 Cal.5th 136, 162.) A " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Where a court's exclusion of defense evidence is erroneous under state law but does not deprive a defendant of his

13

constitutional right to present a defense, prejudice is assessed under the *Watson* standard. (*Fudge*, at p. 1103.)

The trial court's exclusion of defendant's proffered evidence did not deprive him of the right to present a defense. The limited testimony about defendant's demeanor was not central to the prosecution's case, and defendant took the opportunity to address that evidence when he testified that he was trying to "survive" and did not want to show "weakness." The court also ruled that defendant could testify he was "depressed" at the time, although defendant elected not to mention depression in testifying about his demeanor. As defendant was given an opportunity to explain his demeanor, and the explanation he provided did not directly relate to his mental health, additional evidence concerning the specific nature of any mental health issues was not essential to his defense. Some of the excluded evidence was also of questionable relevance, at least with respect to the grounds offered for its admission. Evidence that defendant was taking medication and being treated for depression at the time of his 2024 trial, and had attempted suicide sometime before trial, would provide limited insight into why he appeared nonchalant years earlier when Carrillo's death was discovered in 2019.[1] (Cf. *People v. Gana* (2015) 236 Cal.App.4th 598, 612.) On this record, we cannot say the trial court abused its discretion in excluding that evidence.

We acknowledge the possibility that the trial court's ruling may have resulted in the exclusion of other, relevant evidence. In discussing the scope of permissible testimony about defendant's past and *current* mental condition (including medications he was then receiving at the jail), defense counsel emphasized that defendant had "been treated for depression since he was a child." The court reiterated that defendant could say he was "depressed" in 2019 but could not "talk about his psychiatric diagnosis." The

---

[1] Although the relevant portions of the record do not indicate when defendant's suicide attempt occurred, other information in the record suggests it may have taken place in 2023.

court had sustained an objection to counsel's attempt to question defendant about his mental condition at the time of trial, and the court also precluded defendant's testimony about a depressive diagnosis, even if that diagnosis preceded the charged murder. But even assuming the scope of the court's ruling resulted in the erroneous exclusion of evidence relating to defendant's mental health in 2019, we see no reasonable probability of a different result had such evidence been admitted. Defendant's demeanor immediately following Carrillo's death was a marginal issue, defendant provided an explanation for his demeanor that did not depend on the excluded evidence, and other evidence pointed strongly to defendant's direct involvement in the murder. Any possible error was not prejudicial under the applicable state-law standard.

## C. DEFENDANT'S SENTENCE IS NOT UNCONSTITUTIONALLY CRUEL OR UNUSUAL

Defendant argues his mandatory sentence of life without the possibility of parole—for a murder committed when he was 25 years old—violates the California Constitution's prohibition on cruel or unusual punishment. The power to define punishment for crimes is a legislative function, so we proceed with deference when there is a constitutional challenge to the length of a prison term. (*People v. Baker* (2018) 20 Cal.App.5th 711, 729.) A punishment is cruel or unusual only if it "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Relevant considerations include "(1) the nature of the offense and the nature of the offender with regard to the degree of danger both present to society, (2) a comparison of the punishment with the punishments prescribed for more serious crimes in the jurisdiction, and (3) a comparison of the punishment with punishments for the same offense in other jurisdictions." (*People v. Guenther* (2024) 104 Cal.App.5th 483, 532–533, citing *In re Lynch*, at pp. 425–427.)

In support of his constitutional claim, defendant references his "youth, his ethnicity, and the conditions of the Main Jail in Santa Cruz County," where the crime

occurred.  We recognize defendant was 25 years old at the time of the murder.  As he acknowledges, the California Supreme Court has found a rational basis for the Legislature's "exclusion of offenders who are serving sentences of life in prison without the possibility of parole for a crime committed after the age of 18 from youth offender parole eligibility" under section 3051, subdivision (h).  (*People v. Hardin* (2024) 15 Cal.5th 834, 864.)  Although *Hardin* involved an equal protection claim, not a claim of cruel or unusual punishment, the Supreme Court's holding undermines defendant's argument that a life sentence for a murder committed at age 25 is so disproportionate in light of youth as to be unconstitutional.

Defendant refers to "his ethnicity" and the existence of sentencing disparities based on race or ethnicity, but he does not explain how that renders the sentence disproportionate in this case.  Nor does he explain how what he describes as dangerous conditions and lax security measures at the jail in 2019 render him less culpable for the murder of a fellow inmate.  He offers no comparison between his punishment and the punishments prescribed for more serious crimes in the same jurisdiction, or for the same crime in other jurisdictions.  Defendant has not met his burden of establishing that his sentence is unconstitutionally cruel or unusual.

### D.  IMPOSITION OF A PAROLE REVOCATION FINE

The parties both view the parole revocation fine as erroneously imposed given defendant's sentence on count 1 to life without the possibility of parole.  We acknowledge the parties' logic, but we disagree with its application based on Supreme Court precedent and we therefore do not accept the Attorney General's concession on the point.

Section 1202.45, subdivision (a) states:  "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed

16

pursuant to subdivision (b) of Section 1202.4." In addition to the life term and 10-year enhancement imposed on count 1, defendant also received a concurrent determinate sentence of two years in prison on count 2. His sentence therefore technically " 'includes a period of parole,' " however unlikely he is to ever spend time on parole, and a parole revocation fine was statutorily required. (§ 1202.45, subd. (a); *People v. Baker* (2021) 10 Cal.5th 1044, 1108–1109.) As the Supreme Court has reasoned, "[d]efendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075; see also *People v. Alvarez* (Aug. 18, 2025, S089619) ___ Cal.5th ___ [reaffirming but distinguishing *Brasure* where no determinate term was imposed].)

### III.    DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.


_____

Lie, J.


H052179
*The People v. Cortez*

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASON JOEL CORTEZ,<br><br>    Defendant and Appellant. | H052179<br>(Santa Cruz County<br>Super. Ct. No. 19CR06615) |

BY THE COURT:

Pursuant to California Rules of Court, rule 8.1105(b), the Attorney General's request for publication is hereby granted. It is ordered that the opinion in this matter filed on September 10, 2025 shall be certified for publication.

Dated:

_____
Grover, J.

_____
Greenwood, P. J.

_____
Lie, J.

Trial Court: Santa Cruz County Superior Court
Case No.: 19CR06615

Trial Judge: Hon. Stephen S. Siegel

Attorneys for Defendant/Appellant
Jason Joel Cortez

Kathy Moreno,
  under appointment by the Court of
  Appeal, for Defendant and Appellant

Attorneys for Plaintiff/Respondent
the People:

Rob Bonta
  Attorney General
Lance E. Winters
  Chief Assistant Attorney General
Jeffrey M. Laurence
  Assistant Attorney General
Melissa A. Meth
  Deputy Attorney General
Amit Kurlekar
  Deputy Attorney General
  For Plaintiff and Respondent