Filed 2/3/26  P. v. Mitchell CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES MITCHELL,<br><br>    Defendant and Appellant. | B336502<br><br>(Los Angeles County<br>Super. Ct. No. MA085163) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Strassner, Judge.  Affirmed in part and remanded with directions.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Scott A. Taryle and Sophia A. Lecky. Deputy Attorneys General, for Plaintiff and Respondent.

During a heated family argument, S.F.[1] punched appellant Charles Mitchell in the face several times, knocking him to the ground. After he got up, appellant retrieved a gun from his bedroom and shot into the bedroom S.F. shared with his spouse, V.F. Appellant struck both V.F. and S.F., and he and S.F. exchanged gunfire before appellant fled the family home in his truck. Appellant was apprehended after leading law enforcement on a chase. A jury convicted appellant of assaulting V.F. with a semiautomatic firearm, unlawfully possessing a firearm, and recklessly fleeing a peace officer's motor vehicle, but acquitted him of assaulting S.F. with a semiautomatic firearm. As part of appellant's sentence, the trial court issued a protective order covering V.F. and her adult son, A.F., who was not present during the incident.

Appellant contends his assault and reckless fleeing convictions must be reversed because the trial court did not sua sponte instruct the jury on the defense of unconsciousness. He also argues, and respondent Attorney General agrees, that the court erred by including A.F. in the protective order. We order the protective order modified to strike A.F. as a protected person but otherwise affirm the judgment.

---

[1] We refer to victims by their initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

## PROCEDURAL HISTORY

On May 30, 2023, the People filed an information charging appellant with two counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); count 1, victim V.F., and count 2, victim S.F.),[2] possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and recklessly fleeing a pursuing peace officer's motor vehicle (Veh. Code, § 2800.2; count 4). The information further alleged that appellant personally used a semiautomatic firearm in counts 1 and 2 (§ 12022.5, subds. (a), (d)), and personally inflicted great bodily injury on V.F. in count 1 (§ 12022.7, subd. (a)). It also alleged that appellant suffered prior strike and serious felony convictions. (§§ 667, subd. (a)(1), 667, subds. (b)-(j), 1170.12, subds. (a)-(d).) Additionally, the information alleged numerous aggravating factors pursuant to California Rules of Court, rule 4.241.

A jury found appellant guilty of counts 1, 3, and 4, and found true the firearm and great bodily injury allegations on count 1, the assault of V.F. The jury acquitted appellant of count 2, the assault charge involving S.F. Appellant admitted his strike priors and some of the aggravating factors, and the trial court found true several others. The trial court granted appellant's motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 and struck his strike priors for sentencing purposes. In light of the aggravating factors and "egregiousness of the crimes," the court imposed the high term of nine years on count 1, plus a consecutive term of 10 years for the firearm enhancement. It imposed consecutive terms of eight months each on counts 3 and 4, for an aggregate sentence of 20 years, four

---

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

3

months. Pursuant to section 136.2, subdivision (i), the trial court issued a 10-year protective order naming V.F. and A.F. as protected persons.

Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Case

#### A. *Background*

Appellant was in a long-term, "like 20-something years," relationship with V.F.'s mother, Andrea Hansbury, and lived with Hansbury in her Palmdale home. V.F., her husband S.F., and their adult son A.F. moved into Hansbury's home approximately one year prior to the May 2023 incident.

#### B. *Fight and Shootings*

On the night of May 2, 2023, appellant, V.F., and S.F. were alone in the home; Hansbury was in the hospital and A.F. was not home. V.F. and S.F. both testified that they were in their bedroom when appellant knocked on the door and said they needed to talk. V.F. testified that appellant spoke aggressively and mispronounced V.F.'s name; she "thought maybe he was drunk."

V.F. and S.F. followed appellant into the home's attached garage. Appellant looked at V.F. and asked, "'When are you guys going to leave my house?'" V.F. responded that she would leave when her mother told her to. Appellant, who was standing approximately 17 feet away from V.F., balled up his fists, said, "'we're going to do something about that right now,'" and "charged" or "rushed" at V.F., stopping about two feet away from her. V.F. told appellant to get out of her face. S.F. then stepped in and punched appellant several times with his fist. The blows bloodied appellant's lip and knocked out his tooth; appellant also

4

fell to the ground. S.F., who testified under a grant of use immunity,[3] estimated that he punched appellant for "a minute or so." V.F. filmed the altercation on her cell phone; the video was admitted into evidence and played for the jury. S.F. stopped punching appellant when V.F. told him to. S.F. helped appellant get up, and all three of them left the garage and returned to the house.

Appellant went to his bedroom. V.F. and S.F. went to their bedroom, where V.F. called her mother. V.F.'s mother told V.F. to call a relative to come pick up V.F. and S.F. V.F. and S.F. began gathering their belongings in their bedroom; the door was mostly shut but slightly ajar. A few minutes later, appellant appeared at the doorway. V.F. testified that she was not sure who opened the door. But once it was open, V.F. saw appellant point a gun at her and fire. A bullet struck V.F. in the upper left portion of her chest, and she fell into S.F., who was standing to her left. V.F. said, "I'm shot," or "Mom, he shot me," before hanging up on her mother and calling 911. V.F. told the 911 operator that her "mom's boyfriend" shot her and was still shooting. A recording of the 911 call was played for the jury and admitted into evidence.

S.F. testified that he "went for" his gun once he realized V.F. had been shot.[4] S.F. fired across the hall into the bathroom, hoping to deter appellant from coming back. He then stuck his head out of the bedroom door and looked down the hall toward the garage. Appellant shot at S.F. before going into the garage.

---

[3]     The immunity agreement concerned S.F.'s illegal possession of a firearm and required him to testify truthfully.
[4]     S.F. testified that he realized only later that he also had been shot, when he felt blood on the bottom of his t-shirt.

5

S.F. did not fire back, though appellant continued shooting. S.F. ran out the front door of the house and saw appellant standing outside the garage. Appellant called S.F. a "bitch-ass" and fired more shots at him. S.F. was still holding his gun, but he was out of ammunition; he did not point it at appellant. He ran off the property and hid behind a truck parked two houses away. From that vantage point, he saw appellant get into his own truck and drive away.

Once appellant was gone, S.F. ran back to the house to check on V.F. She was lying on the floor, minimally moving and barely breathing. S.F. picked up V.F.'s phone and spoke to the 911 operator who was still on the line; a recording of this conversation was played for the jury and admitted into evidence. S.F. described appellant's truck and told the operator appellant was drunk and armed with a gun. S.F. hid his gun under the mattress when first responders arrived.

Paramedics transported V.F. to the hospital, where she stayed for "somewhere around eight days." She suffered two broken ribs and had to have part of her lung removed. She also had injuries to her back and beneath her breast. S.F. received stitches for his wound and stayed overnight at the hospital.

### C.    *Pursuit and Arrest*

Los Angeles County Deputy Sheriff Daniel Haven testified that he was on patrol in a marked vehicle on the night of May 2, 2023. Haven received an alert about an assault suspect driving a pickup truck. He saw appellant driving the truck at issue on Sierra Highway in Santa Clarita. Haven initiated a traffic stop, and appellant pulled over. Haven approached the truck on foot, and appellant initially complied with his request to show his hands. After about 15-20 seconds, however, appellant drove

6

away. Haven returned to his patrol vehicle and began pursuing appellant with his lights and siren on.

While Haven was following appellant, he observed appellant run two red lights and exceed the speed limit by approximately 12 miles per hour. When Haven prepared his written report of the incident, his sergeant instructed him not to include the red light violations.

Appellant ultimately stopped further down Sierra Highway, still in Santa Clarita. He complied with all officer commands and was arrested without incident. Footage from Haven's body-worn camera was played for the jury and admitted into evidence.

Deputy Sheriff Ziel Gamiz testified that he responded to "the end of . . . a pursuit call" on May 2, 2023. Deputy Haven was present, and appellant was already outside the truck. Appellant told Gamiz there was a gun in the truck. Another Deputy Sheriff testified that he removed a black semiautomatic firearm from the truck; the nine-millimeter gun "appeared to be in working order."

Gamiz testified that he did not observe any signs of intoxication in appellant and did not perform any sobriety tests. Gamiz testified that appellant seemed "pretty stable on his feet," but Gamiz "assisted him as he walked." Appellant was not arrested for any type of DUI offense.

### D. *Investigation*

Deputy Sheriff Andrew De La Rosa testified that he responded to the Palmdale home on May 2, 2023. He saw two gunshot victims, a man and a woman. He also saw a shell casing in V.F. and S.F.'s bedroom, and another in the kitchen.

De La Rosa later went to hospital, where he spoke to S.F. S.F. did not mention having a gun, and De La Rosa did not recall him saying anything about punching appellant in the garage.

De La Rosa's partner, Deputy Sheriff Salvador Diaz Jimenez, testified that he also responded to the Palmdale home on May 2, 2023. He found nine-millimeter shell casings in the driveway. He also found a black semi-automatic .45-caliber handgun beneath a mattress in one of the bedrooms.

Forensic identification specialist Dan Rosell testified that he took numerous photographs of the Palmdale home; many of them were shown to the jury and admitted into evidence. Rosell photographed and later booked into evidence two nine-millimeter cartridge casings found in the driveway and a live nine-millimeter cartridge found in the kitchen. He also documented "several areas that had possible blood throughout the house," apparent bullet holes in the hall bathroom and bedroom, and a Glock gun and several .45 cartridge casings in the same bedroom.

Sheriff's Detective Christopher May testified that he executed a search warrant at the Palmdale home on May 3, 2023. He observed damage to the hall bathroom and the door of the bedroom across from it. May found a leather gun belt and holster in the closet of the master bedroom, and a prescription bottle with appellant's name on it in the master bathroom.

The parties stipulated that appellant had been previously convicted of a felony and was not lawfully able to possess a firearm.

## II.    Defense Case

Appellant testified that in May 2023, he lived in Palmdale with Hansbury. He had lived there for about 13 years. V.F.,

S.F., and A.F. moved into the house about two months earlier; before that, they lived in a trailer on the property.

On May 2, 2023, appellant arrived at home around 8:00 p.m., after spending the day working and visiting Hansbury at the hospital. Soon thereafter, he told V.F. and S.F. he wanted to talk to them, and they all met in the garage. During the conversation, appellant asked V.F. and S.F. when they were going to leave; "[n]ext thing I know I got punched." The first blow hit appellant's mouth, and he "went down" immediately. He estimated that S.F. subsequently hit him in his face and head about eight more times. Appellant suffered "a few lumps," had teeth knocked out, and had to get stitches. He also testified, "I think I was knocked unconscious." When appellant came to, he was alone in the garage. No one helped him up. He felt "dazed" and scared, and "was shocked" that S.F. had punched him.

Appellant got up and walked to his bedroom. As he passed V.F. and S.F.'s bedroom, he saw S.F. standing inside holding a gun. Appellant "got scared" and ran to his room to grab a gun. On his way there, he heard S.F. load the gun, which frightened him more. Appellant armed himself with a nine-millimeter gun and walked down the hallway toward V.F. and S.F.'s bedroom. As appellant approached, he heard a shot. He started running and then shot back into the bedroom because he was "scared of being shot." Appellant had not planned to use his gun and would not have shot had S.F. not fired at him first. He was "just trying to get out of the house and go to the hospital."

To that end, appellant ran toward the garage. S.F. continued shooting in his direction. Appellant estimated that S.F. fired "like three" shots. Appellant shot back, then went into the garage and unjammed his gun. Appellant then went to get

into his truck so he could go to the hospital. As he was about to get into the truck, he saw S.F. run out the front door with his gun pointed at appellant. Appellant shot at S.F. two more times. S.F. then turned and ran away. Appellant got into his truck and left. He testified that he was heading to his sister's house in Los Angeles. He went past the hospital and drove toward the Santa Clarita area.

En route, appellant "had contact" with some Sheriff's deputies in Santa Clarita. He did not stop the first time they pulled him over because he was scared. Appellant was not drunk and had not had anything to drink prior to leaving the house.

On cross-examination, appellant testified that he fired his gun "I think six times" before he left the house. The first time, he was standing in the hallway. He did not see V.F. at any point during the incident; he "wasn't looking, I was running." Appellant never thought to exit the house, call Hansbury, or call 911. He testified that various windows and doors he could have used to exit the home were closed or blocked.

The next time appellant fired, he shot toward the bedroom from the dining room. When he fired the third and fourth shots, he was running through the kitchen and S.F. was coming out of the bedroom doorway. While he was in the garage, his gun jammed and he paused to fix it.

Appellant fired the final two shots when he was outside near the garage. He aimed toward the front door. He did not hear any gunshots aside from those he was firing.

At some point after appellant left in his truck, he noticed law enforcement vehicles behind him. He stopped the truck but then drove off quickly instead of obeying the officers' commands to exit the truck. He did not stop again until he pulled over the

second time, but did not remember seeing or running any red lights.

## DISCUSSION

## I.    Unconsciousness Instruction

Appellant presented a self-defense theory at trial.  He did not request instructions on any other defensive theories. He now contends the trial court erred by failing to sua sponte instruct the jury on the defense of unconsciousness.  He contends the theory was supported by substantial evidence "in the form of testimony from [V.F.], appellant, and even the prosecutor's argument," and he was prejudiced by the lack of instruction. We conclude there was no substantial evidence that appellant was unconscious at the time of the assault on V.F. or his evasion of law enforcement.

### A.    *Legal Standards*

The trial court has a duty to sua sponte instruct the jury on general legal principles that are closely and openly connected to the facts presented during trial.  (*People v. Aguirre* (2025) 18 Cal.5th 629, 677.)  It also has a duty to sua sponte instruct the jury on a defendant's theory of the case, including defenses the defendant expressly relies on and those that are supported by substantial evidence and not inconsistent with the defendant's theory.  (*Ibid.*)  This obligation extends to affirmative defenses for which the record contains substantial evidence.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

"'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"'" (*People v. Wilson* (2005) 36 Cal.4th 309, 331; see also *People v. Barton* (1995) 12 Cal.4th 186, 201 fn. 8 [substantial evidence is that which "a reasonable jury could find persuasive"].)  "In determining whether the evidence is

11

sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'" (*People v. Salas*, *supra*, 37 Cal.4th at p. 982.) "The trial court is not required to present theories the jury could not reasonably find to exist." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

We review de novo whether the trial court correctly instructed the jury. (*People v. Oropeza, supra,* 151 Cal.App.4th at p. 78.)

**B.** *Analysis*

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge."[5] (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417, citing § 26, subd. (4) (*Halvorsen*).) For purposes of the defense, unconsciousness "need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.'" (*Ibid.*) The law presumes that a person who appears to be acting in a state of consciousness is conscious. (*People v. James, supra,* 238 Cal.App.4th at p. 804.) Accordingly, "the burden is on a criminal defendant to produce evidence rebutting this presumption of consciousness." (*Ibid.*) If a defendant produces substantial evidence that he or she was

---

[5]     Unconsciousness caused by voluntary intoxication may negate specific intent, but it is not a defense to a general intent crime. (*People v. James* (2015) 238 Cal.App.4th 794, 805 (*James*).) Assault with a deadly weapon is a general intent crime. (*People v. Rocha* (1971) 3 Cal.3d 893, 899; *People v. Williams* (2001) 26 Cal.4th 779, 788.) Reckless evasion of a peace officer is a specific intent crime. (See *People v. Taylor* (2018) 19 Cal.App.5th 1195, 1203-1206.)

unconscious, the trial court is obligated to instruct the jury on the theory; the failure to do so is error.  (*Ibid.*)

Appellant contends he carried his burden by testifying that S.F. punched him multiple times in his face and head, that he thought he was knocked unconscious, and that he felt dazed, shocked, and scared when he got up.  He asserts that the blows to the head alone were enough to warrant an unconsciousness instruction, though he also notes that V.F. testified that he seemed drunk, and speculates that he "could have injured his head when he fell to the ground" or suffered a concussion.  Respondent argues that this evidence is self-serving and equivocal.  It further asserts "there was no evidence appellant was unconscious when he committed the two offenses," and his "own testimony vividly recounted the events surrounding the shooting, further undermining any claim that he was unconscious or unaware of his actions."  Respondent's positions more accurately reflect both the record and applicable law.

Although we must credit appellant's testimony, we reject his legal contention that a blow to the head alone constitutes substantial evidence of unconsciousness.  The case law he cites does not support this position.  For instance, *People v. Mathson* (2012) 210 Cal.App.4th 1297, in which a defendant's claim of "'sleep driving'" was at issue, simply stated, "It is well settled that '[a]n unconscious act, within the contemplation of the Penal Code is one committed by a person who because of *somnambulism*, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.'"  (*Id.* at p. 1315 [emphasis in original], quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 717 (*Sedeno*).)  Even assuming this quotation concerning a matter not at issue in the case is

13

pertinent (see *People v. Chavez* (2020) 54 Cal.App.5th 477, 480 ["A case is not authority for propositions not considered."]), it merely states that a blow to the head may *cause* unconsciousness, not that it per se establishes unconsciousness.  Similarly, *People v. Cox* (1944) 67 Cal.App.2d 166, 171-172 concluded the jury should have been instructed on unconsciousness not merely because the defendant sustained a blow to the head, but also because there was evidence that the "blow created traumatic amnesia or automatism, and that while in such unconscious condition he committed an act without being conscious thereof." Appellant has not pointed to, and the record does not contain any substantial evidence suggesting that the blows appellant suffered had any lasting effect on his state of consciousness.

To the contrary, appellant's "own testimony makes clear that he did not lack awareness of his actions during the course of the offenses." (*Halvorsen*, *supra*, 42 Cal.4th at p. 418.)  Appellant testified in great detail about his actions on the evening in question, particularly the shooting incidents at the home.  The "complicated and purposeful nature of his conduct" throughout the event, such as noting the number of shots fired and pausing in the garage to unjam his gun, similarly undermines any suggestion that he was unconscious at the time.  (*Ibid.*)  As the Supreme Court has stated, "in the face of defendant's own testimony that he recalled at least 95 percent of the events surrounding the shooting, only the most tenuous of reasoning might lead the trial court to suspect that defendant might have been unconscious or that he was relying on unconsciousness as a defense. . . .  We do not require such Olympian feats of mental gymnastics of our trial judges." (*Sedeno*, *supra*, 10 Cal.3d at pp. 717-718, overruled on other grounds in *People v. Breverman*

14

(1998) 19 Cal.4th 142, 149, 165.) Appellant "elected a defense that presupposed that he was conscious at the time of the killing" and gave testimony consistent with that presumption.[6] (*Sedeno, supra,* at p. 718.) "The trial court was not required to draw a contrary inference or to instruct, *sua sponte*, on unconsciousness." (*Ibid.*)

Appellant relies on *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*) and *People v. Newton* (1970) 8 Cal.App.3d 359 for the proposition that "a trial court can still commit prejudicial error by failing to instruct on unconsciousness, even when a defendant gives a detailed and coherent account of the incident." In *Halvorsen,  supra*, 42 Cal.4th at p. 418, the Supreme Court rejected the defendant's similar reliance on *Bridgehouse*, emphasizing that in *Bridgehouse*, the defendant testified that his recollection of the time before the shooting was "'very hazy,'" he had gaps in his memory, and characterized his actions as "'distorted by a haze of mental void.'" Like *Halversen*, the instant case is devoid of evidence of a similar haze or void; *Bridgehouse* accordingly is inapposite. We are also unpersuaded by appellant's reliance on *People v. Newton, supra*, 8 Cal.App.3d at p. 373, in which the defendant buttressed his claim that he was rendered unconscious by a gunshot to his abdomen with testimony from a medical doctor who testified that such wounds

---

[6]    Appellant contends for the first time in reply that he "did, in fact, rely on a theory of unconsciousness." This belated contention is not supported by the record. In the portions of reporter's transcript appellant cites, his trial counsel challenged the credibility of V.F. and S.F. and asserted that appellant's claim that he was "shocked" after having "been brutally assaulted" was "a pretty appropriate emotion."

15

are "very likely to produce a profound reflex shock reaction" and commonly cause loss of consciousness.

Appellant also cites *People v. Gana* (2015) 236 Cal.App.4th 598 for the proposition that an unconsciousness instruction should be given "even when defendant's consciousness level was fluctuating." Appellant does not point to any evidence in the record suggesting his consciousness fluctuated at any point during the commission of the charged crimes. Moreover, *People v. Gana* is distinguishable. There, the defendant shot her husband while taking chemotherapy drugs and a prescription sleep aid. (See *People v. Gana*, *supra*, 236 Cal.App.4th at pp. 603-604.) At trial, she recalled some portions of the incident but not others. (See *id.* at pp. 604-605.) Other witnesses testified that she had exhibited objective signs of unconsciousness, including "'a thousand mile stare,'" unresponsiveness to basic questions, and a lack of emotion, and medical experts testified how her medications could affect her mental state. (*Id.* at pp. 609-610.) Here, appellant testified about the incident in great detail, with minimal gaps, and did not offer any evidence that he was unconscious at any point after he left the garage. His failure to recall running the red lights "does not support an inference he was unconscious when he" did so. (*Halvorsen*, *supra*, 42 Cal.4th at p. 418.)

The trial court did not err by failing to sua sponte instruct the jury on unconsciousness.

## II.    Protective Order

Appellant contends, and respondent concedes, that the trial court erred in including A.F. in the protective order issued at sentencing. We agree that the protective order must be modified to strike A.F. as a protected party.

### A.    *Background*

At trial, the only evidence pertaining to A.F. was that he was the adult son of V.F. and S.F. and lived in the Palmdale home.  There was no indication he was present during any of the events at issue.

During appellant's sentencing hearing, V.F. mentioned A.F. during her victim impact statement, stating, "Why did you feel it was okay to tell my baby boy that you would kill him if he's to leave your door unlocked again?  [¶] . . . [¶]  We was never disrespectful at all.  When you needed my husband and son to help, they would go with you no problem."

The People subsequently informed the court that they had prepared a protective order naming V.F., and asked the court to include S.F. and A.F. "because they are in the same household, if the court is willing to check box 3A saying the court finds the protected person's family members have been targeted or harmed by the defendant."  Defense counsel objected, asserting A.F. was "unrelated to this case" and there was not "any evidence before the court to make that kind of finding."  In reply, the People pointed to V.F.'s statement that A.F. "was threatened by the defendant previously."  The court added A.F. to the protective order.

### B.    *Analysis*

Where a defendant is convicted of certain defined crimes of domestic violence, the trial may issue a protective order

"restraining the defendant from any contact with a victim of the crime." (§ 136.2, subd. (i)(1).) "Such orders are limited to defendants convicted of crimes that qualify as "'domestic violence'" and where the protected person qualifies as a "'victim'" of said crime(s)." (*People v. Lopez* (2022) 75 Cal.App.5th 227, 237.) The trial court does not have authority to restrain a defendant from contacting a person who was not present during or otherwise suffered harm from the crime. (*People v. Pena* (2025) 113 Cal.App.5th 640, 648.) For instance, a protective order covering children who were present but asleep during a domestic violence incident was found to be improper. (*People v. Lopez, supra*, 75 Cal.App.5th at p. 237.) "With respect to the issuance of a legally authorized criminal protective order, ""We imply all findings necessary to support the judgment, and our review is limited to whether there is substantial evidence in the record to support these implied findings."" [Citation.]" (*People v. Race* (2017) 18 Cal.App.5th 211, 217; see also *People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 212 ["absent evidence from which the trial court could reasonably conclude that appellant had harmed or attempted to harm [two children], the court lacked authority to issue the no-contact protective order as to the children"].)

We agree with the parties that the record contains no substantial evidence from which the trial court reasonably could conclude that A.F. was "a victim of the crime" subject to protection under section 136.2, subdivision (i)(1). A.F. was not present during the incident, and V.F.'s comments mentioning A.F. during the sentencing hearing were not evidence. We accordingly conclude that the protective order must be modified

to protect the only victim as defined by section 136.2, subdivision (i)(1), V.F.

## DISPOSITION

The convictions are affirmed, and the matter is remanded with directions to the trial court to modify the protective order to remove A.F. as a protected party.  As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


ZUKIN, P. J.


TAMZARIAN, J.


19